FULL NAME
*Jorge Luis Valdez Jr*

COMMITTED NAME (if different)

FULL ADDRESS INCLUDING NAME OF INSTITUTION
*Robert Presley Detention Center*
*PO BOX 710 Riverside CA 92502*

PRISON NUMBER (if applicable)
*201416994*

```
              FILED
      CLERK, U.S. DISTRICT COURT

          APR 2 3 2015

  CENTRAL DISTRICT OF CALIFORNIA
  BY                      DEPUTY
```

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

*Jorge Luis Valdez*

                                    PLAINTIFF,

                v.

*California Highway Patrol*

                                    DEFENDANT(S).

CASE NUMBER **ED CV15 - 00805 DOC (KK)**

*To be supplied by the Clerk*

### CIVIL RIGHTS COMPLAINT
### PURSUANT TO *(Check one)*

☒ 42 U.S.C. § 1983
☐ Bivens v. Six Unknown Agents 403 U.S. 388 (1971)

## A. PREVIOUS LAWSUITS

1. Have you brought any other lawsuits in a federal court while a prisoner: ☐ Yes   ☒ No

2. If your answer to "1." is yes, how many? _____

    Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on an attached piece of paper using the same outline.)

```
              RECEIVED
      CLERK, U.S. DISTRICT COURT

          APR 2 1 2015

  CENTRAL DISTRICT OF CALIFORNIA
  BY                      DEPUTY
```

a.  Parties to this previous lawsuit:
    Plaintiff _____

    _____

    Defendants _____

    _____

b.  Court _____

    _____

c.  Docket or case number _____

d.  Name of judge to whom case was assigned _____

e.  Disposition (For example:  Was the case dismissed?  If so, what was the basis for dismissal?  Was it
    appealed?  Is it still pending?) _____

f.  Issues raised: _____

    _____

    _____

g.  Approximate date of filing lawsuit: _____

h.  Approximate date of disposition _____

## B.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

1.  Is there a grievance procedure available at the institution where the events relating to your current complaint
    occurred?  ☐ Yes   ☒ No

2.  Have you filed a grievance concerning the facts relating to your current complaint?  ☐ Yes   ☒ No

    If your answer is no, explain why not _I BYPASSED THE GRIEVANCE PROCEDURE DUE TO_
    _THIS MATTER BEING A COMPLEX ISSUE THAT HAPPENED DURING AN ARREST_
    _AND NOT WITHIN A FACILITY OR INSTITUTION_

3.  Is the grievance procedure completed?  ☐ Yes   ☐ No

    If your answer is no, explain why not _____

    _____

4.  Please attach copies of papers related to the grievance procedure.

## C.  JURISDICTION

This complaint alleges that the civil rights of plaintiff   _Jorge Luis Valdez Jr._
                                                                  (print plaintiff's name)

who presently resides at   _RPDC. PO BOX 710 RIVERSIDE CA 92502_ ,
                                    (mailing address or place of confinement)

were violated by the actions of the defendant(s) named below, which actions were directed against plaintiff at
_THE JURISDICTION OF CALIFORNIA HIGHWAY PATROL CITY OF COACHELLA CA._
                                    (institution/city where violation occurred)

on (date or dates) _____ , _____ , _____ .
          (Claim I)       (Claim II)       (Claim III)

**NOTE:** You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1. Defendant  *CALIFORNIA HIGHWAY PATROL* _____ resides or works at
   _____
   (full name of first defendant)
   *BLUNDAA DUNES CA.*
   _____
   (full address of first defendant)
   *CALIFORNIA HIGHWAY PATROL*
   _____
   (defendant's position and title, if any)

   The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

   Explain how this defendant was acting under color of law:
   _____
   _____

2. Defendant  *RIVERSIDE COUNTY SHERIFF DEPARTMENT* _____ resides or works at
   _____
   (full name of first defendant)
   *THERMAL CA  THERMAL STATION*
   _____
   (full address of first defendant)
   *RIVERSIDE COUNTY SHERIFF DEPARTMENT*
   _____
   (defendant's position and title, if any)

   The defendant is sued in his/her (Check one or both): ☐ individual   ☒ official capacity.

   Explain how this defendant was acting under color of law:
   _____
   _____

3. Defendant  _____ resides or works at
   _____
   (full name of first defendant)
   _____
   (full address of first defendant)
   _____
   (defendant's position and title, if any)

   The defendant is sued in his/her (Check one or both): ☐ individual   ☐ official capacity.

   Explain how this defendant was acting under color of law:
   _____
   _____

---

**CIVIL RIGHTS COMPLAINT**

4. Defendant _____ resides or works at
   (full name of first defendant)

   _____
   (full address of first defendant)

   _____
   (defendant's position and title, if any)

   The defendant is sued in his/her (Check one or both): ☐ individual   ☐ official capacity.

   Explain how this defendant was acting under color of law:

   _____

   _____


5. Defendant _____ resides or works at
   (full name of first defendant)

   _____
   (full address of first defendant)

   _____
   (defendant's position and title, if any)

   The defendant is sued in his/her (Check one or both): ☐ individual   ☐ official capacity.

   Explain how this defendant was acting under color of law:

   _____

   _____

**D. CLAIMS***

CLAIM I

The following civil right has been violated:

THE EIGHTH AMENDMENT OF PLAINTIFFS CONSTITUTIONAL RIGHTS HAVE BEEN VIOLATED. WHEN EXCESSIVE FORCE OR DEADLY FORCE IS APPLIED WITH THE INTENT OR PURPOSE TO CAUSE SADISTIC OR MALICIOUS HARM, it falls under A CLAIM WITH THE MERITS OF A violation OF CRUEL AND UNUSUAL PUNISHMENT CLAUSE. (NO ROOM FOR QUALIFIED IMMUNITY) DEPUTY MARIANO ANTOS #4219 CHOSE TO OPEN FIRE STATING ON HIS INTERVIEW THAT HE WAS directing HIS SHOTS AT PLAINTIFFS "CHEST" AND LIE TO INVESTIGATORS AND STATE THAT PLAINTIFF STEPPED OUT OF VEHICLE pointing A gun "GANGSTER STYLE" TO COVER UP HIS MALICE. CHP OFFICERS ARE TRAINED MEN, NOT BLIND MEN BUT CHOSE TO ALSO DISCHARGE THEIR WEAPONS WITH A TOTAL of Twelve .223 ROUNDS. GOVERNMENT CODE § 845.6. STATES THAT THE FAILURE TO SUMMON MEDICAL CARE TO A PRISONER WHEN THE EMPLOYEES ACTUALLY "KNEW" OR SHOULD HAVE KNOWN THAT THE PRISONER WAS IN IMMEDIATE NEED OF SUCH CARE IS A VIOLATION. ITS CRUEL AND UNUSUAL PUNISHMENT WHEN PLAINTIFF WAS LEFT WOUNDED & BLEEDING IN A PATROL UNIT AND OFFICERS CHOSE TO IGNORE HIM.

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

Multi-Agencys within RIVERSIDE COUNTY ARE EMPLOYEING CORRUPTED and UNPROFESSIO-nal OFFICERS. BOTH California Highway patrol and Riverside Sheriff ARE EQUAL PARTICIPANTS in THIS MATTER BUT I CHOSE TO ADDRESS THE CHP AS THE MAIN CHARACTER IN THIS claim DUE TO BEING UNDER THE CUSTODY OF THE SHERIFF DEPARTMENT AND FEARING FOR MY SAFETY.

DURING AN ARREST I WAS GIVEN COMMANDS TO STEP OUT OF VEHICLE. AS I followed commands 5 DIFFERENT OFFICERS OPENED UP FIRE STRIKING ME TWICE ON LEFT THIGH. I WAS UNARMED BUT OFFICERS CHOSE TO LIE AND USE AFTER THOUGHTS TO JUSTIFY THEIR ACTIONS AND COVER UP THEIR MALICE. VIDEOS FROM DASH CAMS HAVE BEEN REVIEWED AND SUPPORT MY CLAIM. OFFICERS WENT AS FAR AS SHOOTING ONE OF THE INNOCENT VICTIMS INSIDE VEHICLE AND TRAINING it ON ME.

FURTHERMORE OFFICERS FORCED ME TO WALK ABOUT 50 YARDS AGAINST MY PLEADS OF PAIN AND PLACED ME BEHIND A CHP UNIT BLEEDING AND YELLING FOR MEDICAL CARE FOR ALMOST TWO HOURS. OFFICERS FAILED TO SUMMON MEDICAL CARE WHEN THEY KNEW I WAS WOUNDED. (DISPATCH RECORDS CONTAINING TIME FRAMES ARE ENCLOSED)

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

1    ON APRIL 10 2014 AT ABOUT 5:46 PM, LAW ENFORCEMENT GAVE THE ORDERS

2    TO STEP OUT OF RECREATIONAL VEHICLE (RV) UNARMED AND FOLLOWING ORDERS

3    SHARON GRAFF WAS THE FIRST PERSON WHO ATTEMPTED TO EXIT VEHICLE.

4      DEPUTY MARIANO MATOS BADGE # 4219 WAS THE FIRST OFFICER WHO DISCHARGED

5    HIS AR 15 RIFLE, FORCING SHARON GRAFF TO RETRIVE BACK INTO VEHICLE. SCREAMING

6    DONT SHOOT DONT SHOOT. TO OFFICERS AS SHE FELL AND I WAS ABLE TO PULL

7    HER INTO SAFETY AS WE BINKED UP INSIDE RV's DOOR STEPS. ATTEMPTING TO AVOID

8    INCOMING BULLETS ABOVE OUR HEADS. AS OUR OFFICERS ALSO OPENED UP FIRE.

9      AT NO TIME DID I OR ANYBODY INSIDE OF RV DEMOSTRATE

10   ANY TYPE OF AGGRESIVE THREAT TOWARDS LAW ENFORCEMENT FOR THEM TO

11   ATTEMPT AGAINST OUR LIVES IN THIS MANNER.

12     "AFTER" THE OFFICER INVOLVED SHOOTING SHARON GRAFF WAS ABLE TO

13   SAFELY STEP OUT OF RV but NOT "BEFORE" AS THE FOLLOWING SHERIFF DEPUTY

14   OFFICERS UNETHICALLY STATED TO INVESTIGATORS ATTEMPTING TO BACK UP

15   DEPUTY MARIANO MATOS AND COVER UP SHOOTING AT SHARON GRAFF AS SHE STEPPED OUT :

16       DEPUTY MARIANO MATOS # 4219

17      DEPUTY AARON AMKWCH # 5035

18      DEPUTY JUAN QUEZADA # 4712

19      DEPUTY Sgt. TIMOTHY WHITE # 3245

20   DEPUTY MARIANO MATOS STATED ON HIS INTERVIEW with INVESTIGATOR

21   THAT HE WAS AIMING HIS SHOTS AT MY CHEST... WHAT TYPE OF SWORN

22   DEPUTY OFFICER MAKES SUCH A STATEMENT WHEN HIS "STORY" OF I STEPPING

23   OUT OF RV WITH A GUN AND POINTING IT AT OFFICERS "gangster style"

24   IS FABRICATED? DEPUTY MARIANO MATOS intentionally ATTEMPTED

25   AGAINST MY LIFE.

26      IT TOOK DEPUTY MATOS "ONE ENTIRE MINUTE AFTER HIS

27   INITIAL RADIO DISPATCH TRANSMISSION OF "OFFICER INVOLVED SHOOTING"

28   TO CALL BACK AND STATE "SUSPECT POINTED A WEAPON OFFICER ———

1   INVOLVED SHOOTING." A LATE RADIO DISPATCH TRANSMISSION TO JUSTIFY AND
2   BACK UP HIS CRIMINAL BEHAVIOR.
3        THE FOLLOWING DEPUTYS BACK UP MY CLAIM AND STATED IN THEIR
4   INTERVIEW TO INVESTIGATORS THAT THEY DID NOT SEE NO WEAPON IN MY
5   POSESION AND SAW ONLY A HEAD "POKE" OUT OF RV DOOR WHEN OFFICERS
6   OPENED UP FIRE.
7        DEPUTY DON OLSON #3452 - DEPUTY CLARO SANCHEZ #4765
8        DEPUTY JUSTIN DECKER #4409 - DEPUTY JOE RUIS #2811
9   THE FOLLOWING TWO WITNESSES WERE 100 YARDS TO THE RIGHT OF RV AND
10  HAD BETTER VIEW OF INCIDENT. THESE TWO WITNESSES HAD NO INVOLVE-
11  MENT IN THIS MATTER:
12        CLAUDIA NAVA   AND HER BOYFRIEND
13        LUIS RAMON PRADO GONZALES.
14  ALL INTERVIEWS OF ALL SIX WITNESSES ARE ENCLOSED AND SUSTAIN
15  MY WORDS IN THIS CLAIM.
16
17       THE FOLLOWING FOUR CHP OFFICERS WERE FLANKED OUT TO THE RIGHT
18  OF RV IN THE DESERT AREA, AND HAD A BETTER VIEW OF RV AND INTERIOR
19  THROUGH LONG PASSENGER DOOR. THESE OFFICERS CHOSE TO ENGAGE WITH
20  THEIR AR 15 RIFLES, DISCHARGING ATLEAST NINE RECORDED ROUNDS
21  FROM DIFFRENT POINTS IN THE DESERT AREA WHERE .223 EMPTY CASINGS
22  WERE FOUND AND CHARTED BY FORENSIC TECHNICIANS.
23       DURING INVESTIGATION, THESE FOUR OFFICERS FAILED TO PROVIDE
24  THEIR AR 15 RIFLES INTO EVIDENCE TO CHARTING TECHNICIANS TO CONCEAL
25  THEIR INVOLVEMENT. THEY INSTEAD PROVIDED THEIR HANDGUN WITH FULL
26  CAPACITY AMMUNITION.
27       THESE OFFICERS ARE TRAINED MEN, NOT BLIND MEN BUT THEY CHOSE
28  TO OPEN FIRE ON SHARON GRAFF AND MYSELF, AFTER BEING SHOT TWICE

1  ON MY LEFT THIGH by OFFICERS, I WAS FORCED TO CRAWL OUT OF RV.
2  AFTER BEING HANDCUFFED, OFFICERS REFUSED TO CONSIDER MY CONDITION,
3  AND FORCED ME TO STAND UP AGAINST MY PLEADS OF PAIN AND WALK ABOUT
4  50 YARDS TO A CHP UNIT, WHERE I WAS LEFT WITHOUT MEDICAL CARE
5  BLEEDING AND PLEADING FOR WATER AND MEDICAL ATTENTION FOR
6  ALMOST TWO HOURS, AND TO NO AVAIL. DISPATCH RECORDS SHOW
7  TIME FRAMES AND ARE ENCLOSED)

8      BASED ON ALL THE RECORDED AND FACTUAL EVIDENCE, MULTIPLE
9  AGENCYS ARE ATTEMPTING TO COVER UP THEIR CRIMINAL BEHAVIOR
10 TO PREVENT A LEGAL SUIT. BUT THIS IS BEYOND A LEGAL SUIT.
11 THESE OFFICERS WHO ARE EMPLOYED WITHIN RIVERSIDE COUNTY WHO
12 OPERATE AS IF THEY ARE ABOVE THE LAW ARE DANGEROUS MEN WITH NO REGARD
13 FOR HUMAN LIFE. THEY ARE CORRUPTED OFFICERS WHO MANIPULATE THEIR
14 TRAINING BY ABUSING THEIR TACTICAL METHODS AND PUSH INDIVIDUALS
15 SUCH AS MYSELF TO THE LIMIT BY APPLYING FEAR THEN TAKING OUR LIVES
16 AWAY. THESE OFFICERS OPERATE BY A SILENT OATH AMONGST THEMSELVES
17 TO BACK UP ONE ANOTHER AT ANY COST.

18      BY NO MEANS AM I CONTENDING MY INNOCENCE OF PRIOR
19 CRIMINAL CHARGES THAT LED TO THIS ARREST, but it dosent MEAN
20 that it gives the RIGHT FOR SWORN OFFICERS TO BRAKE PROTOCOL
21 AND UNLAWFULLY ENFORCE "ABOVE" THE LAW TO ATTEMPT AND MURDER
22 HUMAN BEINGS AND GET AWAY WITH IT.

23      This is THE UNITED STATES OF AMERICA, WITH Constitutional
24 RIGHTS & LAWS. THIS IS NOT A WAR ZONE IN ANOTHER COUNTRY. IM
25 RESPONSIBLE FOR MY MISTAKES, IF I BRAKE THE LAW I go TO
26 prison. IF OFFICERS ENGAGE IN CRIMINAL BEHAVIOR THEY SHOULD
27 BE HELD ACCOUNTABLE AND PAY FOR THEIR MISTAKES, IF OFFICERS
28 CANT TELL THE DIFFRENCE BETWEEN A 74 YEAR OLD WOMAN AND A 35—

2

1  YEAR OLD SUSPECT IN BROAD DAYLIGHT, THEN THEY SHOULDN'T BE

2  OFFICERS, THERES NO EXCUSE WHEN "FIVE" DIFFRENT MEN ARE

3  MAKING THE SAME MISTAKE, THERES VIDEO FOOTAGE OF ENTIRE INCIDENT.

4            CHP OFFICER S. RYAS #18811

5            CHP OFFICER J. ZEBROWSKI

6            CHP OFFICER M. BYRD #20541

7            CHP OFFICER J. MORAN #15876

8            SHERIFF DEPUTY M. MATOS #4219

9      THESE OFFICERS WERE THE SHOOTERS INVOLVED IN THIS INCIDENT.

10  THEY SHOT WITH INTENTIONAL HARM AND DISREGARD FOR INNOCENT CASUALTIES

11  THEY LIED TO INVESTIGATORS TO CONCEAL THEIR INVOLVEMENT OR MALICIOUS ACTIONS.

12  THEY INTENTIONALLY LEFT ME SUFFERING AND WITHOUT MEDICAL CARE AS THEY

13  WORRIED AND OCCUPIED THEMSELVES WITH COVERING UP THEIR MISTAKES. WHICH

14  IS CRUEL AND UNUSUAL PUNISHMENT.

15     DISPATCH RECORDS SHOW THAT OFFICERS KNEW OF I BEING WOUNDED

16  BUT FAILED TO PROVIDE OR SUMMON MEDICAL CARE FOR TWO HOURS.

17     OFFICERS OF MULTIPLE AGENCYS THAT ARE CONDONING THESE CRIMINAL

18  ACTIVITIES ARE JUST AS GUILTY AS THE SHOOTING OFFICERS.

19

20

21

22

23            Jorge Luis Valdez Jr.

24

25

26

27

28

**E. REQUEST FOR RELIEF**

I believe that I am entitled to the following specific relief:

(1) I'M REQUESTING AN EQUIVALENT COMPENSABLE RESOLUTION FROM A JURY OF WHAT THE LIFE OF A HUMAN BEING IS WORTH TO THE STATE OF CALIFORNIA HIGHWAY PATROL AND RIVERSIDE COUNTY SHERIFF.

(2) I'M REQUESTING A COMPENSABLE RESOLUTION OF 250,000°° FOR FAILURE TO SUMMON OR PROVIDE MEDICAL CARE WHEN EMPLOYEES OF CHP AND RIVERSIDE COUNTY SHERIFF LEFT ME BLEEDING AND YELLING IN HANDCUFFS FOR ALMOST TWO HOURS WHICH IS CRUEL AND UNUSUAL PUNISHMENT. A VIOLATION OF MY CONSTITUTIONAL RIGHTS (EIGHT AMENDMENT : COWANS V. WYRICK, 862 F.2d 697 (8TH CIR. 1988) (EIGHT AMENDMENT PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT)

(3) I'M REQUESTING A COMPENSABLE RESOLUTION OF 100,000°° FOR MENTAL DISTRESS, PAIN AND SUFFERING.

(4) I'M REQUESTING A COMPENSABLE RESOLUTION OF 100,000°° FOR (USE OF EXCESSIVE FORCE BY POLICE) (MISCONDUCT BY POLICE OFFICERS)

(5) GRANT ANY AND ALL RELIEF NECESSARY IN A JUST RESOLUTION OF THIS CASE.

(6) APPOINTMENT OF COUNSEL TO REPRESENT PETITIONER.

4-17-2015
(Date)

_____
(Signature of Plaintiff)

# Y141000052

# Attachment



| FILE NUMBER | CONTINUATION PAGE | PAGE 3 OF 4 |
|---|---|---|
| Y141000052 | | |

1   **Evidence:** I placed the following item into evidence at the Thermal RSO Station.
2
3   (1) CD – Containing audio interview of the witness (Wit #1) Claudia Nava and (Wit #2)
4   Luis Ramon Prado Gonzalez
5
6   **Details:**   On Thursday 041014 at approximately 1717 hours; I was working uniformed
7   patrol in the unincorporated area of the County of Riverside, State of California. I was
8   driving a clearly marked Riverside County Sheriff patrol vehicle.
9
10   I was contacted by Sgt. Tim White who requested I search the desert area for
11   witnesses to the 215 PC and Officer Involved Shooting. Sgt. White requested I check
12   the area of East of the 86 S Expressway between Avenue 50 and Dillon Road in
13   Coachella.
14
15   I walked into the desert area and located a transient camp. I contacted a Hispanic
16   female by the name of (Wit #1) Claudia Nava. The following is a summary of her
17   statement. I recorded the interview and placed it into evidence.  Claudia said she is
18   homeless She said she was outside eating and saw the incident on the freeway. She
19   saw police following an RV and said it finally stopped.
20
21   Claudia said she saw a lady inside the recreation vehicle come out. The lady was
22   waiving a blouse or something to tell deputies she was there. At that time, Claudia said
23   that is when the "fire" started and the lady when back into the recreational vehicle. I
24   asked her if she heard any gunfire before the lady stepped out. She said she had heard
25   more than 20 gunshots prior to the female stepping out of the vehicle. She said things
26   got "crazy" and she heard gunshots. When I asked her how many shots she heard, she
27   said, "More than 5...more than 10...maybe 20". Claudia said she could not be specific
28   on the amount of gunshots, but stated it was a lot. She said described the officers as
29   "throwing shots". Claudia said she was standing approximately less than 100 yards from
30   where the incident occurred. I asked Claudia if she wears prescription glasses or
31   contacts. She said she does not wear any type of corrected lenses. She said the
32   female was the first person to step out of the vehicle during the incident.
33
34   Claudia said she saw the police shooting during the incident.  She saw police take
35   the female out and place her in a car. She said police then went to take a guy out of the
36   RV. She then mentioned she saw the police take an old guy out of the RV and place
37   him in a helicopter.
38
39   I asked Claudia if she saw any males come out of the RV. She said, "Just two
40   males. The bad and the good one". I asked her if she knew what the "bad one" was
41   wearing. She said, "Black...I think it was a black sweater...I don't know". I asked if he
42   was listening to police and Claudia stated, "He was yelling. He was resisting to the
43   officers". I asked Claudia if she knew what he was yelling. She said she did not know
44   what he was saying, but confirmed he was yelling.
45   She said she did know if he was hurt or not.

| FILE NUMBER<br>Y141000052 | CONTINUATION PAGE | PAGE 4 OF 4 |
| --- | --- | --- |

1      I asked Claudia if she saw the person wearing black with any type of weapon and
2  she said she did not. This ended my interview with Claudia. This is a summary of
3  Claudia's statement and the complete recording was placed into evidence.
4
5      I then spoke to Claudia's boyfriend (Wit #2) Luis Ramon Prado Gonzalez. He stated
6  he is homeless and resides in the desert area in a small shack. The location is in the
7  desert east of 86 S Expressway between Avenue 50 and Dillon Road in Coachella. The
8  following is a summary of Luis's statement. He said he was eating in the desert and
9  heard what he believed to be an ambulance. After sometime, he said he heard many
10  sirens and decided to see what was happening. He said he saw numerous patrol cars
11  chasing a recreational vehicle on the expressway. He said he didn't understand why
12  the driver of the RV would not stop for the police. He said the RV was driving slow, but
13  did not stop.
14
15      I asked Luis if he could give me his estimate on the distance between him and where
16  the RV was located. Luis said he estimated the distance to be between 300 and 350
17  feet. He said he saw the RV come to a stop and police stop behind it. He said he saw
18  the door to the RV open and a female stepped out. He said he did not see who stepped
19  out, but said they waived something that looked like a bandana. He said they were
20  gunshots and he told his girlfriend (Claudia) to get out of the way. He said he heard 20
21  gunshots from where he was standing. He said the female went back into the RV and
22  then came out holding her hands up. Luis said he saw the female walk back to the
23  officers and be placed into a brown car.
24
25      Luis said he then saw police officers surround and approach the RV. He said an
26  officer entered the RV, but then said he could not see what occurred inside. Luis said
27  he then saw a bald male, wearing a black shirt, being taken into custody by police. He
28  said the male was yelling and making noises while being taken to the patrol car. He
29  could tell me what was said because he did not hear it clearly. This ended my interview
30  with Luis. This is a summary of his statement and the recording was placed into
31  evidence.
32
33      This report will be forwarded to investigations.
34
35  **Status:** Opn/CR-2
36
37
38
39
40
41
42
43
44
45
46

# ATTACHMENT - A

# TRANSCRIPTS OF DEPUTY MATOS' INTERVIEW ON 04/10/14, PREPARED BY STENO SOLUTIONS

RIVERSIDE COUNTY SHERIFF CA0330000

| DATE PREPARED: 07/06/14 | | | ☐ INITIAL ☒ SUPPLEMENTAL |
|---|---|---|---|

| FILE NUMBER | DATE/TIME REPORTED | DATE/TIME ASSIGNED | DATE/TIME INV/STATE | DATE/TIME COMPLETED | 6. ADULT ARR | 7. JUV ARR |
|---|---|---|---|---|---|---|
| 141000052 | | | | | 01 | 00 |

| OFFENSES - CODE SECTION | CRIME | COUNTS | 9. EDP CODE |
|---|---|---|---|
| 664/187 PC | Attempted Murder | 01 | 10H1-F |
| OFFENSES - CODE SECTION (Add or Change to) 215 PC | Carjacking | 02 | 11. EDP CODE 12G1-F |
| OFFENSES - CODE SECTION (Add or Change to) O.I.S. | Officer Involved Shooting | 01 | 13. EDP CODE 13C7-N |

| LOCATION OF OCCURRENCE | 15. REP. DIST. | 16. OCCURRED ON: DATE/TIME | 17. OR BETWEEN DATE/TIME |
|---|---|---|---|
| Highway 86 s/o Dillon Rd., Thermal, CA | | 04/10/14-1705 | |

| BUSINESS NAME N/A | 19. BUSINESS PHONE N/A | 20. CASE STATUS / CLEARANCE OPN/CR-2 |
|---|---|---|

## VICTIM -- REPORTING PARTY -- WITNESS -- OTHERS: ☐ SEE ADDITIONAL PERSONS REPORT

| V/R/W 21. NAME (Last, First, Middle) Graff, John (P.B.) | 23. SEX M | 24. RACE W | 25. DOB ▮▮▮ | 26. AGE | 27. HT | 28. WT | 29. HAIR | 30. EYES | 31. SKIN |
|---|---|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | CITY | | | ZIP | | | 32. RES. PHONE ▮▮▮ | | |
| BUSINESS ADDRESS N/A | CITY | | | ZIP | | | 35. BUS. PHONE N/A | | |

| V/R/W 37. NAME (Last, First, Middle) Graff, Sharon (P.B.) | 38. SEX F | 39. RACE W | 40. DOB | 41. AGE | 42. HT | 43. WT | 44. HAIR | 45. EYES | 46. SKIN |
|---|---|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS 32 | CITY | | | ZIP | | | 48. RES PHONE #33 | | |
| BUSINESS ADDRESS N/A | CITY | | | ZIP | | | 50. BUS. PHONE N/A | | |

## SUSPECT: ☒ ADULT ☐ JUVENILE   ☒ PAROLE ☐ PROBATION ☐ SEE ADDITIONAL PERSONS REPORT ☒ ARRESTED

| 52. NAME (Last, First, Middle) Valdez, Jorge (P.B.) | 53. SEX M | 54. RACE H | 55. DOB 09/11/79 | 56. AGE 35 | 57. HT 600 | 58. WT 180 | 59. HAIR BRO | 60. EYES BRO | 61. SKIN LGT |
|---|---|---|---|---|---|---|---|---|---|
| DRIVERS LICENSE NUMBER / ID NUMBER 01779973 | 63. STATE CA | 64. SOCIAL SECURITY NUMBER | | 65. MNI NUMBER | | 66. CII NUMBER A11642581 | | | |
| RESIDENCE ADDRESS 83551 Harrison St., #292 | CITY Coachella | | | ZIP 92236 | | | 68. RES. PHONE N/A | | |
| BUSINESS ADDRESS N/A | CITY | | | ZIP | | | 70. BUS. PHONE N/A | | |

| JUVENILE DISPOSITION | ☐ OTHER JURIES. | ☐ JUV. CRT. PROB. | ☐ WITHIN DEPT. | ☐ DETAINED | ☐ NOT DETAINED |
|---|---|---|---|---|---|

| GANG DATA | 72. TATTOOS / SCARS / MARKS / CLOTHING DESCRIPTION |
|---|---|
| GANG NAME(S): | |
| ☐ Member ☐ Associate ☐ Self Admit ☐ Prior Knowledge | |
| TATTOOS / SCARS / MARKS | |
| ☐ Face ☐ Neck ☐ R. Arm ☐ L. Arm ☐ Hands ☐ Torso ☐ Back ☐ Legs | |

## VEHICLE: ☐ REFER TO CHP 180 FORM FOR STOLEN, RECOVERED, TOWED OR IMPOUNDED

| 73. LICENSE | 76. STATE | 77. YEAR | 78. MAKE | 79. MODEL | 80. BODY STYLE | REGISTRATION EXPIRES |
|---|---|---|---|---|---|---|
| COLOR/COLOR | 83. VIN # | | | 84. OTHER IDENTIFIERS | | 86. DISPOSITION OF VEHICLE |
| REGISTERED OWNER | 87. ADDRESS | | CITY | STATE | ZIP | 88. PHONE |
| | | | | | | 89. DAMAGED PROPERTY VALUE $ |

## ☐ PROPERTY REPORT ATTACHED FOR STOLEN, RECOVERED OR DAMAGED PROPERTY

| REPORTING OFFICER Lead Inv. III Gomez | OFF. I.D. #3018 | REVIEWED BY / DATE [signature] 1698  7-11-2014 | ENTERED BY / DATE | ENTERED BY / DATE |
|---|---|---|---|---|
| COPIES TO: THU-E (Inv. Gomez #3018) x2 | | APPROVED | DIVERSION ENTERED | DOJ REG/CANCELLED |

Form A .frp rev 2/98

Y141000052        **CONTINUATION SHEET**        PAGE 2

## CENTRAL HOMICIDE UNIT PERSONNEL:

| | | |
|---|---|---|
| Sergeant J. Buompensiero #2293 | RSO/CHU-E | (760)393-3500 |
| Master Investigator R. Wortman #2419 | RSO/CHU-E | (760)393-3500 |
| Lead Investigator J. Button #3190 | RSO/CHU-E | (760)393-3500 |

## PROFESSIONS AND STANDARDS BUREAU "PSB" PERSONNEL:

| | | |
|---|---|---|
| Investigator D. Tinker #3467 | RSO/PSB | (951)955-2400 |
| Investigator M. Callahan #2782 | RSO/PSB | (951)955-2400 |

## THERMAL SHERIFF'S STATION PERSONNEL:

| | | |
|---|---|---|
| Investigator D. Butvidas #2437 | RSO/Thermal Investigations Bureau | (760)863-8990 |
| Deputy M. Matos #4219 | RSO/Thermal Patrol Ops | (760)863-8990 |

## CALIFORNIA HIGHWAY PATROL PERSONNEL:

| | | |
|---|---|---|
| Sergeant T. Eglin | CHP/Admin | (619)921-5866 |
| Officer A. Ponce #19807 | CHP/Indio Patrol Ops | (760)772-8911 |
| Officer E. Pena #15339 | CHP/Indio Patrol Ops | (760)772-8911 |

## DISTRICT ATTORNEY'S OFFICE:

| | | |
|---|---|---|
| DDA Pete Nolan | D.A.'s Office/Indio | (760)863-8216 |

## FORENSICS PERSONNEL:

| | | |
|---|---|---|
| Forensic Tech. J. Jernegan #N3435 | RSO/Forensics-E | (760)863-7710 |
| Forensic Tech. M. Ruiz #N5957 | RSO/Forensics-E | (760)863-7710 |
| Forensic Tech. L. Land #N4213 | RSO/Forensics-E | (760)863-7710 |
| Forensic Tech. E. Rodriguez #N4195 | RSO/Forensics-E | (760)863-7710 |
| Forensic Tech. K. Wilson #N3857 | RSO/Forensics-W | (951)210-1200 |
| Forensic Tech. T. Conrad #N4611 | RSO/Forensics-W | (951)210-1200 |

## ASSOCIATED CASE NUMBERS:

Thermal Sheriff's Station Incident/Case #C140990010 - 10851 VC
California Highway Patrol Incident/Case #140410IC00298

## ATTACHMENTS:

A: 2014 Google Earth aerial/satellite photograph of the scene - Highway 86 s/o Dillon Rd. Thermal, CA.

## EVIDENCE:

| Item | Description |
|---|---|
| G001 | *Digital Media DVD-R Disc* - Disc containing digital photographs and audio recordings *Barcode #1663104* |

*The above listed item(s) was booked into evidence at the Thermal Sheriff's Station.*

## AREA & SCENE DESCRIPTION:

       This scene is located within the unincorporated area of Riverside County known as Thermal.  This area of Thermal is scarcely populated agricultural properties and desert terrain.  The primary crime scene was located along the southbound lanes of Highway 86, to the south of Dillon Rd.

The Highway 86 roadway is a two lane paved asphalt roadway for north/south traffic. The two nearest roadways to the scene were identified as Dillon Rd., to the north and Tyler St., to the south. The traffic lanes of Highway 86 are divided and there are no curbs or sidewalks. There are dirt shoulders along both sides of the roadway, which are bordered by vegetation and desert terrain. There were no visible streetlights located or noted along this area of Highway 86. On the date of this investigation 04/10/14, the weather conditions were noted as being mildly hot, with clear skies and increased winds and little to no changes in temperature or weather conditions.

All documentation, digital photography and scene investigation and processing, was conducted and supervised by Lead Investigator Button, with the assistance of Forensic Tech's Jernegan, Ruiz, Wilson and Conrad. *(Refer to supplemental reports for further details)*

I have attached a copy of the 2014 Google Earth aerial/satellite photograph of the scene for orientation purposes only. This photograph does not depict or is intended to depict the aerial/satellite view of the location on the date of the incident and/or investigation. *(Refer to attached aerial/satellite photograph for further details)*

**DETAILS:**

On Monday, March 10, 2014, at approximately 1800 hours, I was contacted by Sergeant J. Buompensiero of the Riverside County Sheriff's Departments Central Homicide Unit *(CHU)*. Sgt. Buompensiero requested that I respond to 1012 Dolly Way, Lake Elsinore, in reference to a *"Car-Jacking and Officer Involved Shooting"* investigation. The suspect in this case was identified as *Jorge Valdez*, of Indio, California.

I arrived on scene at approximately 2015 hours, and met with the remaining members of the Central Homicide Unit, the Profession and Standards Bureau, the Thermal Sheriff's Station's Investigations Bureau, and the California Highway Patrol. I obtained the known facts during the briefing and was tasked with assisting Master Investigator Wortman. The details of the briefing will be covered in the primary report by Master Investigator Wortman.

At the conclusion of the briefing, I joined Investigator's Wortman, Button, and Butividas, along with DDA Nolan and Forensic Tech's Jernegan and Ruiz, in a walkthrough of the crime scene, of which consisted of the southbound lanes of Highway 86. I took several digital photographs of the scene for reference and then downloaded them onto the above listed Digital Media DVD-R disc (G001), of which was later booked into evidence at the Thermal Sheriff's Station.

At the conclusion of the walk through, Master Investigator Wortman and I responded to the Thermal Sheriff's Station for interviews, while Investigator Button conducted the scene investigation and processing. *(Refer to supplemental reports for further details)*

Once at the Thermal Station, I assisted Master Investigator Wortman with the charting and interview of Deputy Matos, as well as the interview of suspect, Jorge Valdez. *(Refer to supplemental reports for further details)*.

A copy of this report will be forwarded to Master Investigator Wortman of the Central Homicide Unit.

**STATUS:** OPEN/CR-2

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                                    Page 1

INTERVIEWER:            INVESTIGATOR NELSON GOMEZ
                        INVESTIGATOR DAVE TINKER
DATE/TIME:              04/10/2014    2353 HOURS
INTERVIEW WITH:         DEPUTY MARIO MATOS
                        ATTORNEY MIKE WILLIAMSON
FILE NUMBER:            Y 14 100 0052

Deputy Matos, Mario #4219 041014-WS600305.MP3

| | |
|---|---|
| INVESTIGATOR GOMEZ: | And I'm on. It's April 10th, 2014, at 2353 hours -- it'll be Investigator Gomez with the Central Homicide Unit. We will be at the Thermal Sheriff's Station in reference to Young-14-100-052. It's the officer-involved shooting on Interstate 86 and Dillon. Present at this time is Deputy Mario Montez. |
| DEPUTY MARIO MATOS: | Mario Matos. |
| INVESTIGATOR GOMEZ: | Matos? I'm sorry. ID Number 4219. |
| DEPUTY MARIO MATOS: | Correct. |
| INVESTIGATOR GOMEZ: | His attorney -- |
| MIKE WILLIAMSON: | Mike Williamson. |
| INVESTIGATOR GOMEZ: | And an investigator with the Professional Standards -- |
| INVESTIGATOR TINKER: | Dave Tinker. |
| INVESTIGATOR GOMEZ: | Deputy Mantos -- |
| DEPUTY MARIO MATOS: | Matos. |
| INVESTIGATOR GOMEZ: | -- Matos -- this interview is basically -- we're -- it's to request an involuntary statement from you as to the events of this evening. This has nothing to do with the administration side of the department. This is a criminal portion of the investigation as to the officer-involved shooting. The Central Homicide is also conducting a criminal investigation as to the criminal acts by the suspect in this, okay. |
| DEPUTY MARIO MATOS: | Okay. |
| INVESTIGATOR GOMEZ: | But this portion -- our interview with you is as to the criminal involvement of officers. |
| DEPUTY MARIO MATOS: | Okay. |
| INVESTIGATOR GOMEZ: | Do you understand that? |
| DEPUTY MARIO MATOS: | Yes, sir. |
| INVESTIGATOR GOMEZ: | Okay. You've had a conversation with your attorney? |
| DEPUTY MARIO MATOS: | Yes, sir. |
| INVESTIGATOR GOMEZ: | Okay. And you understand that this is a voluntary statement on your part? |
| DEPUTY MARIO MATOS: | Yes, sir. |

INVESTIGATOR GOMEZ:      Okay. If anyone has directed you or told you that you are being ordered to interview or to conduct an interview with me, I'm here to tell you that that's not the case.

DEPUTY MARIO MATOS:      Yes, sir.

INVESTIGATOR GOMEZ:      Okay. Has anyone approached you or told you that?

DEPUTY MARIO MATOS:      No, sir.

INVESTIGATOR GOMEZ:      Okay. Are you willing to give me a statement as to what happened this evening?

DEPUTY MARIO MATOS:      Yes.

INVESTIGATOR GOMEZ:      Okay.

MIKE WILLIAMSON:         I need to make a comment if I can.

INVESTIGATOR GOMEZ:      Yes.

MIKE WILLIAMSON:         You have Investigator Tinker sitting over there in spite of the fact that he is from Professional Standards Bureau, and later on, he will compel you to give a statement for administrative purposes. You understand that you have the right to have him out of this room and that his presence here should not indicate to anybody that you're being forced to give this interview. Do you understand that?

DEPUTY MARIO MATOS:      Yes, sir.

MIKE WILLIAMSON:         Okay. And you're freely and voluntarily permitting Investigator Tinker to be in this room right now?

DEPUTY MARIO MATOS:      I am.

MIKE WILLIAMSON:         All right.

INVESTIGATOR GOMEZ:      Okay. All right. Let's start off -- when did your shift start tonight?

DEPUTY MARIO MATOS:      It started at 07 this morning.

INVESTIGATOR GOMEZ:      Dayshift?

DEPUTY MARIO MATOS:      Dayshift -- Watch II.

INVESTIGATOR GOMEZ:      What was your designator tonight -- or today?

DEPUTY MARIO MATOS:      2-Young-81.

INVESTIGATOR GOMEZ:      And what was your patrol area?

DEPUTY MARIO MATOS:      The city of Coachella.

INVESTIGATOR GOMEZ:      Coachella?

DEPUTY MARIO MATOS:      Yes, sir.

INVESTIGATOR GOMEZ:      Okay. All right. So, obviously, you've been on patrol -- where are we at, past -- well,

it doesn't matter. What day of the week is this for you?

**DEPUTY MARIO MATOS:** Well, it's Thursday.

**INVESTIGATOR GOMEZ:** Your Thursday?

**DEPUTY MARIO MATOS:** Yeah.

**INVESTIGATOR GOMEZ:** Okay. Obviously, your day went out without any incidents until, obviously, your involvement in this pursuit with CHP.

**DEPUTY MARIO MATOS:** Yes, sir.

**INVESTIGATOR GOMEZ:** Okay. What exactly -- what information do you have as to what led to the officer-involved shooting?

**DEPUTY MARIO MATOS:** Um, a beat partner of mine received a call of 11-10 from CHP, which is backup. They requested backup of one to two deputies. They were in pursuit of a stolen vehicle in the area of Tyler Street.

The vehicle had crashed and a male occupant was seen fleeing the vehicle running through an apartment complex, and they were requesting our assistance. Um, I was initially assigned to a missing-child call, um and I had them put that call back in pending, and I showed myself to back the primary unit.

While en route, um, I got toned out from dispatch advising -- they were advising me that there was a carjacking that had just occurred on the other side of the apartment complex where the male was seen running.

Um, the circs -- the -- the circumstances were the male who they believed was the same suspect C -- CHP was chasing, approached a husband and wife, pointed a -- a handgun at them, and carjacked them for their green, Nissan Altima. You want me to keep going?

**INVESTIGATOR GOMEZ:** Well, when CHP initially put out the 11-10, did they ever give a description as to the subject?

**DEPUTY MARIO MATOS:** Hispanic male with tattoos on his -- on his head.

**INVESTIGATOR GOMEZ:** No clothing descriptions?

**DEPUTY MARIO MATOS:** I -- I don't remember.

**INVESTIGATOR GOMEZ:** Okay. On that second incident -- now that you got the carjacking -- was there a description on the suspect?

**DEPUTY MARIO MATOS:** Hispanic male, multiple tattoos, dark clothing, um, handgun.

**INVESTIGATOR GOMEZ:** Okay. Did they give a description of the handgun, or just general handgun?

**DEPUTY MARIO MATOS:** I got a description when I arrived on the scene. I requested a Code-3 response. I got authorized by the watch commander to roll code. I arrived approximately three minutes later with the victim of the first carjacking.

Um, I first got a suspect description, direction of travel, weapon description -- and I

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                                    Page 4

immediately put that out over the air. Um, I started to coordinate a perimeter at that point, and that's when dispatch -- approximately five minutes later, dispatch advised there was a traffic collision on the 86, I believe, in the area of 62, and they believed it was the green, Nissan Altima with the carjacking suspect.

| INVESTIGATOR GOMEZ: | What's the distance from where you took that carjacking to where the -- the vehicle TC'd -- if you know? |
|---|---|
| DEPUTY MARIO MATOS: | So you got 50 to 62 that's -- approximately eight to ten miles. |
| INVESTIGATOR GOMEZ: | Okay. The -- what was the description you had from the victims of the carjacking? |
| DEPUTY MARIO MATOS: | Black T-shirt, black pants, multiple tattoos, Hispanic, bald haircut, um and a handgun -- a black handgun. |
| INVESTIGATOR GOMEZ: | That was your description? A black -- |
| DEPUTY MARIO MATOS: | That was it, yes, sir. |
| INVESTIGATOR GOMEZ: | Okay. Just handgun? They didn't say it was semi auto? Revolver? Nothing? |
| DEPUTY MARIO MATOS: | They didn't say semi at all. They just said, "Black handgun." |
| INVESTIGATOR GOMEZ: | Okay. Do you remember the name of that victim? |
| DEPUTY MARIO MATOS: | I believe the last name was Torres. |
| INVESTIGATOR GOMEZ: | Okay. |
| DEPUTY MARIO MATOS: | I know his wife name was Dulce Torres because she was the owner -- registered owner of the vehicle. |
| INVESTIGATOR GOMEZ: | Okay. Do you remain on scene with the carjacking or -- at what point do you clear that scene? |
| DEPUTY MARIO MATOS: | Um, as soon as they put out that the -- the TC on 86 Expressway where they believed the suspect was, Sergeant Wedertz and another unit were responding. |
| | Then we got information -- at that time I was starting to fill out the 180 -- the CHP 180 for the 215 vehicle, and they received information that the suspect was attempting to carjack further motorists on the Expressway. |
| | At that point, I felt -- there was only two units at -- at -- at the scene at the time, so I told the victim we would be back to enter his vehicle in as stolen and take his report, and I -- and I cleared that and responded to -- to the area to assist the deputies. |
| INVESTIGATOR GOMEZ: | What other information was dispatch putting out about the subject and his, now -- what's it going to be -- second carjacking attempt? Anything else in reference to him? |
| DEPUTY MARIO MATOS: | I recall them saying that he was pointing guns -- pointing a gun at -- at passing motorists. They were northbound on the 86, and that he was attempting to -- to carjack a -- a -- a second victim. I believe that was it. |
| INVESTIGATOR GOMEZ: | Okay. So, obviously, you clear your scene because it -- it -- the -- |

DEPUTY MARIO MATOS:    We have an active scene going on over here.

INVESTIGATOR GOMEZ:    Okay. Why -- you start responding.

DEPUTY MARIO MATOS:    I started --

INVESTIGATOR GOMEZ:    Anything else get broadcasted there -- during that time?

DEPUTY MARIO MATOS:    Yes. As I was responding, Sergeant Wedertz advised that the suspect had possibly carjacked a motor home. He advised he's -- there was a, I believe, gray motor home that was passing him on the express -- 86 Expressway northbound, and the driver of the vehicle -- he described -- had his hands in the air and was -- and then started pointing back towards the rear of the motor home, and -- and, I guess, appeared, you know, frightened.

Sergeant Wedertz believed that -- that the suspect had carjacked the motorist of the -- of the motor home, and that he -- and that he had put out that they were northbound on the 86. I believe they were approaching 60.

INVESTIGATOR GOMEZ:    Okay.

DEPUTY MARIO MATOS:    At that point, I was already on the 86. The next exit off the 86 would be Avenue 56 or Airport Boulevard. I positioned my unit in the center of southbound and northbound traffic. There's a -- a large dirt embankment there or dirt area.

INVESTIGATOR GOMEZ:    Median?

DEPUTY MARIO MATOS:    Median -- I parked my vehicle and I -- and I wait for the units to -- to pass me. They were all following the motor home. There was -- I believe, three undercover or stealth vehicles -- RSO vehicles, Sergeant Wedertz, a K-9 unit, and, at that point, I want to say two to three CHP units following.

INVESTIGATOR GOMEZ:    What happens next?

DEPUTY MARIO MATOS:    They pass me approximately 40 miles an hour. Um, I start traveling northbound on the 86 Expressway approximately ah; I'd say, 15 feet behind a stealth unit -- oh, no -- behind the K-9.

Sergeant Wedertz and Sergeant White were both putting out information. I believe Sergeant White was calling the pursuit. Um, at one point, I believe they relinquished the pursuit to CHP. We allowed multiple CHP units to get in front of us.

Um, backing up, before I got into the pursuit, I retrieved my personal rifle from -- from the trunk of my car, and I had it in the -- in the front with me inside --

INVESTIGATOR GOMEZ:    Okay.

DEPUTY MARIO MATOS:    Inside the cab.

INVESTIGATOR GOMEZ:    And that's your River Rock AR-15?

DEPUTY MARIO MATOS:    Rock River --

INVESTIGATOR GOMEZ:    Rock River.

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                                    Page 6

DEPUTY MARIO MATOS:     -- --AR-15 -- correct. While we were following him, I advised Sergeant Wedertz that I had a -- a long rifle.

Um, at some point, I believe as we were approaching Avenue 52, Sergeant Wedertz advised RSO units to -- to, "Back off the pursuit."

Um, he was mainly talking to us Watch II units to back off the pursuit. About 30 seconds -- or, no, within five seconds, ten seconds, he called me on my personal phone, and said, "Hey, you -- you -- you do have a long rifle with you?"

I said, "Yes, sir, it's in -- it's on my lap ready to deploy." He said, "Okay. I want you to stay in the pursuit, and deploy, and help CHP with the deployment of your long rifle."

So since he gave me that -- that order, I stayed in the pursuit. I allowed CHP to be in front of me. There was approximately ten to -- eight to ten CHP units in front of me all along with our K-9 and two stealth units, and I was the -- I was trailing.

I asked Sergeant Wedertz if we had a unit that can move ahead to spike strip the -- the -- the vehicle -- or if we wanted to do that. He said --

INVESTIGATOR GOMEZ:     And the vehicle is -- that we're talking about is the --

DEPUTY MARIO MATOS:     Is the motor --

INVESTIGATOR GOMEZ:     -- RV? Motor home?

DEPUTY MARIO MATOS:     -- is the RV, yes. He -- Sergeant Wedertz relayed that information to dis -- to dispatch and asked them to ask CHP -- since they were primary on the pursuit -- if they wanted us to do that. He advised he did have spike strips.

Initially, CHP said they did not want to spike-strip the vehicle because there was victims inside. However, I noticed them deploying spike strips around Avenue 52 -- somewhere in that area -- or 86 Expressway -- cross of Avenue 52 northbound.

Um, they, again, deployed them at Avenue 50 -- I'm sorry, 86 Expressway, northbound cross of Avenue 50. Um, I believe the second deployment was successful. The vehicle started to slow down to approximately five miles an hour. It lost one of its wheel. I don't know which one. It was just a real -- one of the wheels went in the roadway, and to -- it came to a rest on the northbound 86 Expressway.

At that point, I exited my vehicle with my rifle. I advised dispatch I was deploying the long rifle. Um, I ran up to the first CHP unit on the passenger side. There was a CHP officer sitting there with a -- with a long rifle with the -- with the window down, and he was using that as cover -- the door.

I came alongside him -- just east of him, and that's leading up into the -- to the OIS. Do you want --

INVESTIGATOR GOMEZ:     So you're on the passenger side just to the east of the officer?

DEPUTY MARIO MATOS:     In the -- in -- in the dirt area -- correct.

INVESTIGATOR GOMEZ:     Okay. Was there another unit there, or were you out in the open?

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST

| | |
|---|---|
| DEPUTY MARIO MATOS: | No. There's a -- it's the CHP unit. He's in -- he's taking cover behind the -- behind the door with the window down -- AR pointing through the open window. |
| INVESTIGATOR GOMEZ: | Uh-huh. |
| DEPUTY MARIO MATOS: | I, kind of, used the edge of his door, so we were, kind of, side-by-side -- |
| INVESTIGATOR GOMEZ: | Okay. |
| DEPUTY MARIO MATOS: | -- as cover. |

(short pause)

And we had multiple -- I believe there was, maybe, one or two more units directly to our west on line, and multiple units behind us.

| | |
|---|---|
| INVESTIGATOR GOMEZ: | What's the time frame from the initial -- from when you get the word of the CHP in pursuit of a -- of a 10-32 -- a stolen vehicle -- to now, you're on the 86 with the vehicle stopped? |
| DEPUTY MARIO MATOS: | Let's see, I know I received my missing child at approximately 1701. I was just going 97 when the call came out, so I would say, that would be 1710, and I want to say -- to where we stopped him, it's going to be about 1740, so, maybe, a half an hour -- around there. |

(short pause)

| | |
|---|---|
| INVESTIGATOR GOMEZ: | And -- |
| DEPUTY MARIO MATOS: | And -- |
| INVESTIGATOR GOMEZ: | -- this is all continuous -- |
| DEPUTY MARIO MATOS: | All continuous. |
| INVESTIGATOR GOMEZ: | -- right? Radio traffic? |
| DEPUTY MARIO MATOS: | Yes. |
| INVESTIGATOR GOMEZ: | Everything's happen -- okay. |
| DEPUTY MARIO MATOS: | Okay. |
| INVESTIGATOR GOMEZ: | So now you're positioning yourself next to the CHP officer. What are you seeing? What are you hearing? |
| DEPUTY MARIO MATOS: | A group of CHP officers go in front of us. I lower my weapon, so I don't flag them. They go in front us and take up a position in the shrubbery area to the east of the 86 Expressway. I believe there's a -- like, a little wire fence that went on the other side in the shrubbery area, so we had -- so that way we had fields of fire connecting fields of fire, and we weren't -- there wasn't no flagging issues between our weapons. We didn't cross fire, and -- so I noticed them take up their position.

Really quick, we -- I -- I hear somebody gives orders to -- to, "Step out of the vehicle." I don't know who was doing it. |

**RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST**        Page 8

| | |
|---|---|
| INVESTIGATOR GOMEZ: | Was that on a P.A. or just -- |
| DEPUTY MARIO MATOS: | You know. |
| INVESTIGATOR GOMEZ: | Just -- |
| DEPUTY MARIO MATOS: | I don't -- I don't remember someone -- I just re -- recall someone saying, "Step out of the vehicle." |
| INVESTIGATOR GOMEZ: | Uh-huh. |
| DEPUTY MARIO MATOS: | Um, I see a fe -- a -- a White, female adult exit the vehicle through the passenger, main door into the RV. She exits with her hands up. A CHP officer orders her to the rear of the unit -- or to the rear of the RV. *FALSE* |

(short pause)

| | |
|---|---|
| | As she's walking from the RV to the CHP unit which is probably 15 feet -- 15 to 20 feet, I see an H -- Hispanic male, adult, bald head -- stick his head out of the -- out of fro -- out of the door, and I could see half of his torso and -- and his head, and I could see his left hand, and his right hand, and he start -- and he's looking at all -- at all the -- it looks like he's looking at all of us *FALSE* |

*WHICH IS IT?*
*DOOR OR WINDOW*

| | |
|---|---|
| INVESTIGATOR GOMEZ: | Checking his surroundings. |
| DEPUTY MARIO MATOS: | Checking his surroundings. *FALSE* |
| INVESTIGATOR GOMEZ: | Is the female saying anything, or is she just complying with the orders and walking back? |
| DEPUTY MARIO MATOS: | She was walking back. She got out of my peripheral, so I don't know what happened with her once she got out of my peripheral vision. It's just -- she's walking -- coming through my peripheral, and my concentration goes to the suspect -- or to a Hispanic, male adult sticking his head out the window. |
| INVESTIGATOR GOMEZ: | What happens then? |
| DEPUTY MARIO MATOS: | I notice him -- I notice he has a -- a handgun. It looks like a black or dark-colored -- what I -- what I -- what I perceived to be a handgun in his -- in his hand. He's holding it, and I see him pull the -- swing the -- swing the muzzle around and direct it right at me. I see the barrel of the -- of the handgun. *FALSE* |
| | At that point, I feared that, a basically, he's -- he's a barricaded subject. I -- I feel that he's going to -- to fire the weapon at me since the barrel came right at me. At that point, due to me fear -- fearing for my life -- that he's going to engage me, I engaged him. *FALSE* |

(short pause)

| | |
|---|---|
| INVESTIGATOR GOMEZ: | Now, you said it's the passenger door. Now, on an RV, you got the front, entry door, you know, the -- the typical passenger door. |
| DEPUTY MARIO MATOS: | Correct. |
| INVESTIGATOR GOMEZ: | And then sometimes in that living space area, then you have the other main door. Do |

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                                    Page 9

_you know which door exactly it was that he was sticking his head out of?_

| | |
|---|---|
| DEPUTY MARIO MATOS: | It would be -- it would be -- if you -- if you -- on your typical RV, the big, long door -- |
| INVESTIGATOR GOMEZ: | Okay. |
| DEPUTY MARIO MATOS: | -- that, kind of, has steps to go up into an RV -- that big door that swings out -- not like a regular car door that -- |
| INVESTIGATOR GOMEZ: | Got you. |
| DEPUTY MARIO MATOS: | -- just swings -- you know, passenger -- yeah. |

(short pause)

| | |
|---|---|
| INVESTIGATOR GOMEZ: | Was he saying anything to anyone? |
| DEPUTY MARIO MATOS: | I didn't hear him say anything. |
| INVESTIGATOR GOMEZ: | And you didn't hear anything prior to her coming out or him sticking his head out? |
| DEPUTY MARIO MATOS: | No. |
| INVESTIGATOR GOMEZ: | You never heard any gunshots? Nothing? |
| DEPUTY MARIO MATOS: | No. |
| INVESTIGATOR GOMEZ: | Were any sirens going on at that time from any of the units? |
| DEPUTY MARIO MATOS: | There could have been. I -- I was really focused on that -- on that door. |
| INVESTIGATOR GOMEZ: | Okay. So you said he's got the firearm. Is he holding it extended out or -- |
| DEPUTY MARIO MATOS: | Kind of, holding -- *FALSE* |
| INVESTIGATOR GOMEZ: | -- gangster style? |
| DEPUTY MARIO MATOS: | -- gangster style, cocked sideways, and it's, kind of, close to his body, and he's -- and he's moving the barrel with his head, so where his head is moving, that's where the barrel's going, and he looks right at me with the barrel, and, like I said, you know, he's already carjacked two people, and going on in my mind, he's already committed two violent crimes, and I -- I didn't know how far he was willing to go, and, you know -- *FALSE* |
| INVESTIGATOR GOMEZ: | He's not making any attempts to negotiate, communicate -- as far as you know? |
| DEPUTY MARIO MATOS: | Not making any attempts to come out. There -- there was orders, you know, "Let me see your hands. And, "Come out of the vehicle." |
| INVESTIGATOR GOMEZ: | And you, obviously, have a female who's exited, and she's following the commands. *FALSE* |
| DEPUTY MARIO MATOS: | She's following the commands. She looks very distraught as she's coming out. *AFTER FACT* |
| INVESTIGATOR GOMEZ: | Okay. So what happens then? |
| DEPUTY MARIO MATOS: | Like I said, as soon as he -- as soon as I see the barrel trained on me, I fire |

RIVERSIDE COUNTY- LAW ENFORCEMENT AGENCIES
FORM O (9-81)

approximately three rounds -- from what I can remember -- from my AR -- I also hear shots being fired in the area where the CHP had set up in the shrubbery area.

And what I see is -- I can see rounds impacting approximately six to ten inches away from -- from the door just south of the door: I see impacts on the -- on the side panels in the area where the suspect's chest is, and that's in the -- that's in the direction that I was shooting. Um, he immediately -- once shots are fired, he immediately -- I just see him disappear out of view back into the -- into the RV.

(short pause)

INVESTIGATOR GOMEZ:    Now, the only information you had as to the occupants of the car, obviously, were the driver; right -- that's a male. That initially comes out from Sergeant Wedertz?

DEPUTY MARIO MATOS:    What was that again.

INVESTIGATOR GOMEZ:    The -- the -- the occupant -- the driver -- the -- the who was driving the vehicle?

DEPUTY MARIO MATOS:    The victim?

INVESTIGATOR GOMEZ:    Yeah, the victim.

DEPUTY MARIO MATOS:    Uh-huh.

INVESTIGATOR GOMEZ:    Only information you had was that it was a male; right?

DEPUTY MARIO MATOS:    A male -- I -- I believe he said wearing a green shirt.

INVESTIGATOR GOMEZ:    Okay. But then, all the sudden, you have a female coming out?

DEPUTY MARIO MATOS:    A female coming out.

INVESTIGATOR GOMEZ:    You still have a suspect inside who's armed?

DEPUTY MARIO MATOS:    Correct.

INVESTIGATOR GOMEZ:    You don't know where the driver's at?

DEPUTY MARIO MATOS:    Correct.

INVESTIGATOR GOMEZ:    He's standing at the door with a firearm.

DEPUTY MARIO MATOS:    Correct. FALSE

INVESTIGATOR GOMEZ:    Not coming out, obviously, but he's not chasing the female either.

DEPUTY MARIO MATOS:    And he matched the description of that the victim of the first carjacking had originally given me -- black T-shirt, shaved head, Mexican.

INVESTIGATOR GOMEZ:    Okay.

DEPUTY MARIO MATOS:    Or Hispanic.

INVESTIGATOR GOMEZ:    What happens next?

| | |
|---|---|
| DEPUTY MARIO MATOS: | He disappears out of view. As at some point -- I don't know who debriefed the female or got information from her, but she's advising that -- that the suspect had shot the other victim in the -- in the vehicle -- who was supposed to be the male driver. |
| | Numerous people are giving orders to -- to, "Come out of the vehicle." The -- they're -- they keep telling him, "Come out of the vehicle. Come out of the vehicle." |
| | I see a handgun fly -- or being thrown out from the vehicle. It lands on the 86 Expressway on the asphalt. I then see two -- two hands extend out of the -- of the RV, kind of, like, if somebody was laying on the floor of the RV. They were towards the bottom where someone would -- would step. The hands were dark in color, consistent with his -- with his face, so I -- I believed it to be the suspect's hands. |
| | Um, I believe CHP was giving him the orders, "Come out. Come out." And he crawls out of the -- crawls out of the RV and lays face down head facing east. Feet -- feet facing west, and prones out on the floor. Hands were spread out to the side. |
| | At that time, Cor -- Corporal Olsen that was a motor officer with us -- sends the -- they form an arrest team. I know it was Corporal Olsen. We had K-9, Deputy Monges, myself, Deputy Sanchez, and I think, Deputy Quezada was also present. |
| | We -- I advised CHP we were making the approach. The -- CHP was in the shrubbery so, that way, they can shift their fire, and we don't have a cross-fire issue. We make an approach on him. |
| | Um, I tell the -- I tell the deputies to let the K-9 make -- give the orders. K-9 starts to give the orders, you know, "Spread your -- or keep your feet apart, or keep your hands to your side." |
| | I go on the east side of the -- of the K-9 and train my weapon towards the back of the suspect covering the K-9 while he's giving the orders. |
| | When I'm doing that, I could see inside the -- the -- the front of the RV, and I see a White male adult, leaning back on the seat when -- really, you could only see the -- the top of his belly, and I thought, he -- you know, since I had information he had been shot -- |
| INVESTIGATOR GOMEZ: | Uh-huh. |
| DEPUTY MARIO MATOS: | -- I believed he was -- he -- you know, suffering from a -- a gunshot wound. The suspect was also yelling, and I could see some blood on his -- on his right arm -- don't know who went up and cuffed him. It wasn't K-9. It was one of the other assisting deputies. Someone got him into handcuffs. |
| | At that point, um, everyone else goes -- all the -- the arrest team goes in and clears the trailer for additional suspects. I stay out, and, from there, I -- I walked back to where Sergeant Wedertz is, and I advise him that -- that I was the one -- that I was in the OIS. |
| INVESTIGATOR GOMEZ: | Okay. |
| DEPUTY MARIO MATOS: | And, also, during the OIS, where -- when I shot, I also advised, "Shot -- shots fired," and that I was involved in the OIS. |
| INVESTIGATOR GOMEZ: | Okay. You put it over -- out over the air? |

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST

DEPUTY MARIO MATOS: I put it out over the air. There was some confusion. Sergeant White believed that only CHP was involved in the OIS. And I got over the air a second time and said, "Negative. 2-Young-81 -- I was involved in the -- in the OIS."

INVESTIGATOR GOMEZ: Was that immediately after, or later on, down the line?

DEPUTY MARIO MATOS: That was immediately after.

(short pause)

INVESTIGATOR GOMEZ: The firearm that you saw the suspect toss out -- was that the same firearm that you saw pointed in your direction?

DEPUTY MARIO MATOS: That -- I -- that, I can't say. It -- it -- it was a dark -- it was a dark handle. He did throw out a dark -- or, I'm sorry, dark barrel. He did throw out a dark handgun, so I -- I -- I would assume that that was the same firearm.

INVESTIGATOR GOMEZ: Okay. Because you had no other information that he possibly had another firearm?

DEPUTY MARIO MATOS: I had no other information of -- of any other firearms in the vehicle at the time.

INVESTIGATOR GOMEZ: Do you know if any other firearms were found in the vehicle?

DEPUTY MARIO MATOS: For -- for certain, no -- I -- I heard -- someone had told me that there was another weapon in the vehicle, but I didn't -- never got eyes on it or never -- I wasn't part of the investigation of that.

INVESTIGATOR GOMEZ: That hearing -- or hearing, or briefing, whatever it was -- I mean, was that from the female -- whoever debriefed --

DEPUTY MARIO MATOS: No.

INVESTIGATOR GOMEZ: -- her, or was that just after fact?

DEPUTY MARIO MATOS: After fact.

INVESTIGATOR GOMEZ: Okay. So the only information that was debriefed from the female was that her husband had been shot by the suspect -- nothing else?

DEPUTY MARIO MATOS: Correct.

INVESTIGATOR GOMEZ: The CHP units that were just to the east of you are -- were they in his line of fire when he was, basically, check -- checking the area with his firearm out?

DEPUTY MARIO MATOS: Yes, he went to them -- he went out, looked directly at them, and scanned over to -- over to me, so yes.

INVESTIGATOR GOMEZ: And, again, he never communicated anything with you?

DEPUTY MARIO MATOS: Never communicated nothing.

INVESTIGATOR GOMEZ: And you had no idea what was going on in that vehicle --

DEPUTY MARIO MATOS: No.

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                                                                    Page 13

INVESTIGATOR GOMEZ: — within the interior compartment of that vehicle?

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        Other than his actions already previously where he's, obviously, endangering the public?

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        And, as far as you know, I mean, from the initial pursuit, it was uniformed officers who were pursuing him.

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        Black-and-white units?

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        CHP units?

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        Okay. Once, basically, the perimeter is set, obviously, there was black-and-white units in the perimeter area?

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        If he did see them, he would know that they were officers?

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        Okay. We get all the way -- now, we got a second carjacking. Again, being pursued, black-and-white uniformed officers.

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        Vehicle is stopped, vehicles surrounding him, uniformed officers.

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        And, at no point, he never tried to communicate whether he was going to give himself up? Nothing?

DEPUTY MARIO MATOS:        No.

INVESTIGATOR GOMEZ:        No?

DEPUTY MARIO MATOS:        No.

INVESTIGATOR GOMEZ:        And the first actions you see of him -- he's got a barrel pointed out, and he's -- basically, he's scanning the area?

DEPUTY MARIO MATOS:        Correct.

INVESTIGATOR GOMEZ:        Okay.

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                                        Page 14

| | |
|---|---|
| DEPUTY MARIO MATOS: | Which he scans the area, and I see the barrel come to rest in my -- in my direction towards me. |
| INVESTIGATOR GOMEZ: | And you really don't -- I mean, you have cover, but you don't have cover. |
| DEPUTY MARIO MATOS: | Correct. |
| INVESTIGATOR GOMEZ: | Because you have a CHP officer who's got the majority -- |
| DEPUTY MARIO MATOS: | Majority of the cover. |
| INVESTIGATOR GOMEZ: | -- of the -- |
| DEPUTY MARIO MATOS: | Correct. |
| INVESTIGATOR GOMEZ: | Okay. Was his view -- would it -- and -- and I don't know if you know this or not, I mean, basically, but he's -- he's in the same point -- looking at the same direction as you, but you're farther out. You got a better view of that door. |
| DEPUTY MARIO MATOS: | Correct. |
| INVESTIGATOR GOMEZ: | How much of that threshold of that door do you think he made out? |
| DEPUTY MARIO MATOS: | Like, I -- |
| INVESTIGATOR GOMEZ: | Obviously, you said you could see his head, and you could see -- |
| DEPUTY MARIO MATOS: | I could see his head. I could see his left shoulder, left arm, and probably half of the form of the right -- of the right arm, which is the arm that he had the gun in -- or the hand that he had the gun in, and I could see the left chest area and some of the left abdomen. |
| INVESTIGATOR GOMEZ: | And the only time you see him is immediately after the female come out already. |
| DEPUTY MARIO MATOS: | Correct. |
| INVESTIGATOR GOMEZ: | So he possibly -- and I'm not asking you to speculate, but the female runs out, and now he's sticking himself out. |
| DEPUTY MARIO MATOS: | Correct. |
| INVESTIGATOR GOMEZ: | Right? Okay. |
| (short pause) | |
| | Did you recognize him at all -- since you work out here? |
| DEPUTY MARIO MATOS: | You know, I don't -- no, I didn't. |
| INVESTIGATOR GOMEZ: | Not familiar to you at all? |
| DEPUTY MARIO MATOS: | I -- I really didn't get -- I -- I did see his face, but I -- you know, it was such -- it happened so fast, you know. Maybe, if I -- if I see his tattoos, it would -- it would trigger. I -- I'm pretty sure I -- I didn't, I -- right off the back, I didn't know (inaudible). |

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                                    Page 1b

INVESTIGATOR GOMEZ:      So other than the circumstances today, you don't know anything about -- it -- how about if I give you a name?  You think you would recognize the name?

DEPUTY MARIO MATOS:      Sure.

INVESTIGATOR GOMEZ:      Whether he was wanted for -- for anything?

DEPUTY MARIO MATOS:      Sure.

INVESTIGATOR GOMEZ:      Jorge Valdez.

DEPUTY MARIO MATOS:      No.

INVESTIGATOR GOMEZ:      Or George?

DEPUTY MARIO MATOS:      No.

INVESTIGATOR GOMEZ:      No?

(heavy static)

                         I don't have anything else at this point.

MIKE WILLIAMSON:         No, nothing for me.

INVESTIGATOR GOMEZ:      All right.  I'm going to call it midnight:23 hours, and I appreciate your time.

DEPUTY MARIO MATOS:      All right.

(recording ends)

REPORTING OFFICER:  INVESTIGATOR NELSON GOMEZ

D: 04/10/2014   T: 05/12/2014   Job:  969.DSS.68   RW:da

RIVERSIDE SHERIFF DEPARTMENT/INDIO                    Page 1

```
 1   INTERVIEWER:              INVESTIGATOR DAMEN BUTVIDAS
 2   DATE/TIME:                04/11/2014    0010 HOURS
 3   INTERVIEW WITH:           DEPUTY CLARO SANCHEZ 007
 4   FILE NUMBER:              Y 14 100 0052
 5
 6
 7        INVESTIGATOR BUTVIDAS:  All right.  Today's date is April 11th, 2014.  It's about 0010 hours.
 8   I'm here with Deputy CLARO Sanchez, ID Number --
 9
10        DEPUTY CLARO SANCHEZ:  4765.
11
12        INVESTIGATOR BUTVIDAS:  4765?  This is regarding a officer-involved shooting --
13   Young-14-100-0052.  Deputy Sanchez was not one of the officers who shot their firearms.  He was merely
14   present during the events that transpired.  Can you just tell me what you saw, what you heard, and what you
15   did?
16
17        DEPUTY CLARO SANCHEZ:  Just regarding the -- from the beginning of the --
18
19        INVESTIGATOR BUTVIDAS:  Uh-huh?
20
21        DEPUTY CLARO SANCHEZ:  -- incident?  Okay.  My -- myself, Quezada, Maxwell, and
22   Sergeant White were at the station.  We heard the pursuit go off for CHP.
23
24        INVESTIGATOR BUTVIDAS:  Okay.
25
26        DEPUTY CLARO SANCHEZ:  So then we went to our units to go assist, heard the 215 come out,
27   and we exited the station, went down -- eastbound on Airport.  Quezada was in front of me.
28
29        INVESTIGATOR BUTVIDAS:  Okay.
30
31        DEPUTY CLARO SANCHEZ:  He -- I saw them going northbound, and I continued to go -- take
32   the position of Airport and the Expressway.
33
34        INVESTIGATOR BUTVIDAS:  Okay.
35
36        DEPUTY CLARO SANCHEZ:  Because they were asking for a perimeter, so I stay there while the
37   whole traffic's going on.  They put out the vehicle description which is the Nissan Altima, and then, a few
38   minutes later, they -- CHP told us that the vehicle had crashed at 62 and the Expressway.
39
40        INVESTIGATOR BUTVIDAS:  Okay.
41
42        DEPUTY CLARO SANCHEZ:  I was the closest unit, so I -- I jump on the Expressway -- go
43   southbound.  Sergeant Wedertz is behind me.  I end up arriving -- pass -- about 100 yards past 62 right
```

RIVERSIDE SHERIFF DEPARTMENT/INDIO                    Page 2

1    before the bridge.
2
3            INVESTIGATOR BUTVIDAS:  Okay.
4
5            DEPUTY CLARO SANCHEZ:  I'm getting flagged down with people saying like, -- there was a
6    car from the northbound lanes, so I parked my car in the center median.  I crossed the northbound lanes,
7    and I see the Nissan Altima -- or a Nissan Altima had TC'd into the -- the dirt.
8
9            INVESTIGATOR BUTVIDAS:  Okay.
10
11           DEPUTY CLARO SANCHEZ:  I asked the passerbys (sic) if they saw who was in the car -- the
12   person that was inside of the car.  They said they didn't see anything.  As I wait -- waited for additional
13   units before I go clear the car, Quezada, Maxwell, and K-9 -- Monges --
14
15           INVESTIGATOR BUTVIDAS:  Uh-huh.
16
17           DEPUTY CLARO SANCHEZ:  -- arrive, and as we're getting ready to clear the vehicle, a passerby
18   stops -- a -- a female -- Hispanic female, and she tells us that there is a subject behind her in the street who
19   was pointing a gun at people in the car, so, at that point, myself and Maxwell started running down the
20   Expressway, basically, up the bridge.
21
22           INVESTIGATOR BUTVIDAS:  Uh-huh.
23
24           DEPUTY CLARO SANCHEZ:  To see if we can see the suspect, and then I see the -- the RV who
25   was also involved, passes, but I didn't see who was inside the RV or anything.
26
27           INVESTIGATOR BUTVIDAS:  Uh-huh.
28
29           DEPUTY CLARO SANCHEZ:  Another car after the RV tells me that the suspect that had the gun
30   went inside the RV -- which, at that point, I put it out over the air that the suspect was potentially inside the
31   RV.
32
33           INVESTIGATOR BUTVIDAS:  Uh-huh.
34
35           DEPUTY CLARO SANCHEZ:  Somebody else confirmed that the -- when they were passing that
36   the driver put their hands up, so I put it out and then started running to my car.  Quezada and Sergeant
37   White get behind the -- the RV.
38
39           INVESTIGATOR BUTVIDAS:  Uh-huh.
40
41           DEPUTY CLARO SANCHEZ:  They go into pursuit, and I just tried to catch up.
42
43           INVESTIGATOR BUTVIDAS:  Okay.

**RIVERSIDE SHERIFF DEPARTMENT/INDIO**                                    **Page 3**

1
2   DEPUTY CLARO SANCHEZ:  We followed all the way through, and then a bunch of CHPs units
3   get in, so it's also probably, like, fall behind.  I pull back and try to spike it at 52 -- which, I guess, that it
4   wasn't successful.  I -- I was --
5
6   INVESTIGATOR BUTVIDAS:  You tried to spike it, or somebody else tried to spike it?
7
8   DEPUTY CLARO SANCHEZ:  No, sir.  CHP did.
9
10  INVESTIGATOR BUTVIDAS:  Okay.
11
12  DEPUTY CLARO SANCHEZ:  I saw -- I -- keep -- there were so many CHP cars in front of me,
13  and the RV was ahead of me that I didn't see, but I saw, once we passed, that they had pulled the spikes.
14
15  INVESTIGATOR BUTVIDAS:  Okay.
16
17  DEPUTY CLARO SANCHEZ:  And I heard over the radio that they tried to, and then I saw them at
18  50th -- they pulled another set of spikes for them, so I'm assuming they spiked him again at 50th.
19
20  INVESTIGATOR BUTVIDAS:  Okay.
21
22  DEPUTY CLARO SANCHEZ:  Then it goes -- right before we get to Dillon about -- what -- 200
23  yards, they come to a stop.  When the car stops, Sergeant White's in front me, and then Deputy Quezada
24  was in front of Sergeant White.  I knew that, because I -- I was going to get my AR, and my AR was in
25  Quezada's trunk.
26
27  INVESTIGATOR BUTVIDAS:  Oh, okay.
28
29  DEPUTY CLARO SANCHEZ:  So get out of my car, go to Quezada's trunk to get my AR, so I
30  loaded the magazine, chamber a round, and I, basically, go to the -- to the front where everybody was
31  setting up to -- to put the RV at gunpoint.
32
33          As I'm walking out towards the -- one of the side vehicles, I see Matos there, and then -- so
34  I'm, basically, going up and making an approach.  I hear -- or I -- all the sudden, I hear the shots.  He fires
35  the shots.  I don't know how many shots he fired.
36
37  INVESTIGATOR BUTVIDAS:  Okay.
38
39  DEPUTY CLARO SANCHEZ:  So, at that point I -- I kneel down.  I get next to him, and I wasn't
40  sure if the suspect had fired.
41
42          And -- so I asked him, hey, if they had fired, and, obviously, I didn't see no shots fired, and
43  then -- when he was -- when the shots were fired, I saw the suspect, I didn't see no gun or anything, but

**RIVERSIDE SHERIFF DEPARTMENT/INDIO**                        **Page 4**

1    I -- I saw him. He came out. The shots were fired, and then he quickly went back inside.
2
3          INVESTIGATOR BUTVIDAS:   Okay.
4
5          DEPUTY CLARO SANCHEZ:   Held it for a couple more minutes, and then the female -- the wife
6    came out.
7
8          INVESTIGATOR BUTVIDAS:   Uh-huh.
9
10         DEPUTY CLARO SANCHEZ:   She just had her bra on, and then we gave her commands to come
11   towards us, and they briefed her -- they debriefed her, and then about another minute or so late -- later --
12   what seemed like a minute -- then the -- a gun flew out of the door opened again.
13
14         INVESTIGATOR BUTVIDAS:   Uh-huh?
15
16         DEPUTY CLARO SANCHEZ:   And then a -- a gun flew out, and the suspect came out with his --
17   he stuck his hands out.
18
19         INVESTIGATOR BUTVIDAS:   Uh-huh.
20
21         DEPUTY CLARO SANCHEZ:   And, basically, came out, and he proned out.
22
23         INVESTIGATOR BUTVIDAS:   Okay.
24
25         DEPUTY CLARO SANCHEZ:   And then, from that point, we -- we formed an arrest team.  It was
26   Corporal Olson, Quezada, myself, Maxwell, Matos.  I think that was it -- everybody that I can remember --
27   and we approached the vehicle.
28
29         INVESTIGATOR BUTVIDAS:   Uh-huh.
30
31         DEPUTY CLARO SANCHEZ:   Myself and Quezada covered the door.  We didn't know if there
32   was other suspects.  I -- I don't -- I wasn't paying attention on who cuffed the guy.
33
34         INVESTIGATOR BUTVIDAS:   Uh-huh.
35
36         DEPUTY CLARO SANCHEZ:   Somebody -- I think a CHP guy cuffed him.
37
38         INVESTIGATOR BUTVIDAS:   Okay.
39
40         DEPUTY CLARO SANCHEZ:   And then we went inside the -- the RV.  I saw the -- the guy was in
41   the -- the driver was in the driver's seat.  He said he got shot in the shoulder.  We clear the RV.  There
42   was -- we deemed it safe, and then I went back out, and that was it.
43

**RIVERSIDE SHERIFF DEPARTMENT/INDIO**                                    **Page 5**

1    INVESTIGATOR BUTVIDAS:   Okay.  So that's, kind of -- it may sound silly -- what I'm going to
2    ask you -- questions that are clarifying, but you said that you found the max -- or the Altima --

4    DEPUTY CLARO SANCHEZ:  Uh-huh.

6    INVESTIGATOR BUTVIDAS:   -- and you said it was out in the dirt, and what side of the -- what
7    side of the freeway or the Expressway are we talking about?

9    DEPUTY CLARO SANCHEZ:  Okay.  I went southbound then I stopped --

11   INVESTIGATOR BUTVIDAS:  Uh-huh.

13   DEPUTY CLARO SANCHEZ:  -- the car.  It looked -- it was -- it looked like it crossed southbound
14   towards the center -- crossed the northbound lanes.

16   INVESTIGATOR BUTVIDAS:  Uh-huh.

18   DEPUTY CLARO SANCHEZ:  And then it -- it went, kind of, like, downhill, and the car was
19   facing south.

21   INVESTIGATOR BUTVIDAS:   Okay.  So you're talking about on the east side of the
22   Expressway?

24   DEPUTY CLARO SANCHEZ:  Yeah, it was -- it was -- it was east of the northbound lanes.

26   INVESTIGATOR BUTVIDAS:   Okay.

28   DEPUTY CLARO SANCHEZ:  On the bottom.

30   INVESTIGATOR BUTVIDAS:   Did anybody -- I mean, did anybody identify any of the people
31   that were flagging you guys down -- saying that the guy had the gun and was waving it at -- at people who
32   were driving?  Do you know?

34   DEPUTY CLARO SANCHEZ:  The guys that flagged me down saying that the Nissan was there --

36   INVESTIGATOR BUTVIDAS:  Uh-huh.

38   DEPUTY CLARO SANCHEZ:  -- they -- I -- they said -- one of the guys was saying, "Hey, this
39   guy almost crashed into me."

41          That's why he had stopped.

43   INVESTIGATOR BUTVIDAS:  Okay.

RIVERSIDE SHERIFF DEPARTMENT/INDIO                    **Page 6**

1
2    DEPUTY CLARO SANCHEZ:  But they didn't say -- they didn't say anything about a gun.
3
4    INVESTIGATOR BUTVIDAS:  Okay.
5
6    DEPUTY CLARO SANCHEZ:  So I was asking them -- and it all went quick.
7
8         I was asking them, "Hey, do you know where he's at?"
9
10        It was my concern where he's at.
11
12        And then they said, "No. We didn't see where he went. We don't know where he's at."
13
14   INVESTIGATOR BUTVIDAS:  Okay.
15
16   DEPUTY CLARO SANCHEZ:  And then, around that time, we were getting ready to move, and
17   then somebody unrelated pulled up --
18
19   INVESTIGATOR BUTVIDAS:  Uh-huh.
20
21   DEPUTY CLARO SANCHEZ:  -- and said, "Hey, there's a guy in the -- in the -- at the road in the
22   back. He's -- he's pointing guns at cars."
23
24        So that's why we took off running.
25
26   INVESTIGATOR BUTVIDAS:  Okay. Okay. So nobody -- I just want to say, if -- if -- I mean,
27   not that you even had any time just to get any of their name -- names or anything like that, so that didn't
28   happen?
29
30   DEPUTY CLARO SANCHEZ:  Oh, no.
31
32   INVESTIGATOR BUTVIDAS:  Right? You guys had to take off?
33
34   DEPUTY CLARO SANCHEZ:  No, because, at that point, like I said, I ran. We -- me and
35   Maxwell ran, and then he was in the RV, and then, from there, I ran, and -- and I got into the -- my car.
36
37   INVESTIGATOR BUTVIDAS:  Uh-huh?
38
39   DEPUTY CLARO SANCHEZ:  Which was on the southbound lanes and I crossed the center
40   median, and I went behind --
41
42   INVESTIGATOR BUTVIDAS:   Took off behind the RV.
43

RIVERSIDE SHERIFF DEPARTMENT/INDIO                    Page 6

1
2      DEPUTY CLARO SANCHEZ: But they didn't say -- they didn't say anything about a gun.
3
4      INVESTIGATOR BUTVIDAS:  Okay.
5
6      DEPUTY CLARO SANCHEZ: So I was asking them -- and it all went quick.
7
8            I was asking them, "Hey, do you know where he's at?"
9
10           It was my concern where he's at.
11
12           And then they said, "No.  We didn't see where he went.  We don't know where he's at."
13
14     INVESTIGATOR BUTVIDAS:  Okay.
15
16     DEPUTY CLARO SANCHEZ:  And then, around that time, we were getting ready to move, and
17     then somebody unrelated pulled up --
18
19     INVESTIGATOR BUTVIDAS:  Uh-huh.
20
21     DEPUTY CLARO SANCHEZ:  -- and said, "Hey, there's a guy in the -- in the -- at the road in the
22     back.  He's -- he's pointing guns at cars."
23
24           So that's why we took off running.
25
26     INVESTIGATOR BUTVIDAS:  Okay.  Okay.  So nobody -- I just want to say, if -- if -- I mean,
27     not that you even had any time just to get any of their name -- names or anything like that, so that didn't
28     happen?
29
30     DEPUTY CLARO SANCHEZ:  Oh, no.
31
32     INVESTIGATOR BUTVIDAS:  Right?  You guys had to take off?
33
34     DEPUTY CLARO SANCHEZ:  No, because, at that point, like I said, I ran.  We -- me and
35     Maxwell ran, and then he was in the RV, and then, from there, I ran, and -- and I got into the -- my car.
36
37     INVESTIGATOR BUTVIDAS:  Uh-huh?
38
39     DEPUTY CLARO SANCHEZ:  Which was on the southbound lanes and I crossed the center
40     median, and I went behind --
41
42     INVESTIGATOR BUTVIDAS:   Took off behind the RV.
43

**RIVERSIDE SHERIFF DEPARTMENT/INDIO**          Page 7

1  DEPUTY CLARO SANCHEZ:  Yeah.
2
3  INVESTIGATOR BUTVIDAS:  Okay.
4
5  DEPUTY CLARO SANCHEZ:  Yeah, I don't know -- I don't know if any -- I don't know if
6  anybody -- I don't think anybody got the block-outs of those people.
7
8  INVESTIGATOR BUTVIDAS:  Yeah, I didn't figure.
9
10  DEPUTY CLARO SANCHEZ:  Yeah.
11
12  INVESTIGATOR BUTVIDAS:  I just -- I just wanted to ask -- and then you said you saw -- you
13  heard -- you heard Matos specifically shoot, or you --
14
15  DEPUTY CLARO SANCHEZ:  I heard --
16
17  INVESTIGATOR BUTVIDAS:  -- you saw him?
18
19  DEPUTY CLARO SANCHEZ:  I -- when I came up, I heard the rifle, and then I also heard --
20  because the CHP guys that were out -- out on the desert -- there's -- I saw -- as -- as I was coming up, I can
21  see the CHP guys crossing the -- the, like, desert.  They went to the fence, and they, kind of, took a position
22  off to the side.
23
24  INVESTIGATOR BUTVIDAS:  So on the east side of the Expressway?
25
26  DEPUTY CLARO SANCHEZ:  The Expressway, yeah.
27
28  INVESTIGATOR BUTVIDAS:  Okay.
29
30  DEPUTY CLARO SANCHEZ:  And then I -- I -- I heard the shots.  Basically, it was Matos. I don't
31  think anybody was with him, and I heard -- and I looked up.  That's when I saw the suspect, and I could see
32  the window shattering from the shots.
33
34  INVESTIGATOR BUTVIDAS:  Okay.
35
36  DEPUTY CLARO SANCHEZ:  And then --
37
38  INVESTIGATOR BUTVIDAS:  So tell me a little bit -- just a little bit more in detail about what
39  you saw when the shots -- now, tell me everything you saw when you saw the shots.
40
41  DEPUTY CLARO SANCHEZ:  I'm -- I'm pulling up to try to take a position next to -- next to
42  Matos.
43

RIVERSIDE SHERIFF DEPARTMENT/INDIO                          Page 8

1    INVESTIGATOR BUTVIDAS:  Uh-huh.
2
3    DEPUTY CLARO SANCHEZ:  And then the shots get fired as I'm looking up, and then I can see
4    the suspect. Basically, it was going, like -- there's the (inaudible). I can't -- I wouldn't even be able to say
5    if it -- I saw a -- a body. I was, like -- it was coming out.
6
7    INVESTIGATOR BUTVIDAS:  Uh-huh.
8
9    DEPUTY CLARO SANCHEZ:  And then the fires got shot, and then he -- he went back in.
10
11   INVESTIGATOR BUTVIDAS:  Okay.
12
13   DEPUTY CLARO SANCHEZ:  That's what I saw, but I can't -- yeah. I didn't see no gun or --
14
15   INVESTIGATOR BUTVIDAS:  Okay.
16
17   DEPUTY CLARO SANCHEZ:  But I was also not set up on point, like --
18
19   INVESTIGATOR BUTVIDAS:  Okay. So you just didn't have a clear view of --
20
21   DEPUTY CLARO SANCHEZ:  Correct.
22
23   INVESTIGATOR BUTVIDAS:  Okay. All right. Okay. Ya I think that's -- I think that's it. I can't
24   think of anything else I didn't ask you, and I'll terminate this interview.
25
26          (recording ends)
27
28   REPORTING OFFICER:  INVESTIGATOR DAMEN BUTVIDAS
29
30   D: 04/11/2014  T: 04/14/2014   Job: 149.DSS.68  DM:da

RIVERSIDE SHERIFF DEPARTMENT/INDIO                    Page 1

1   INTERVIEWER:              INVESTIGATOR DAMEN BUTVIDAS
2   DATE/TIME:                04/10/2014    2335 HOURS
3   INTERVIEW WITH:           CORPORAL DON OLSON 006
4   FILE NUMBER:              Y 14 100 0052
5
6
7        INVESTIGATOR BUTVIDAS:  Today's date is April 10th, 2014.  It is about 2335 hours.  I'm here
8   with Corporal Don OLSON, ID Number --
9
10       CORPORAL DON OLSON:      3452.
11
12       INVESTIGATOR BUTVIDAS:  -- 3452.  This is an interview regarding a -- an officer-involved
13  shooting, Young-14-100-052.  Corporal OLSON is not a shooter deputy.  He is a witness deputy only.
14  Corporal OLSON, you can just tell me what -- what you remember?
15
16       CORPORAL DON OLSON:      It was about quarter after 5:00.  I was leaving the station to go
17  home.  I had heard earlier information about a CHP pursuit where the suspect fled and carjacked another
18  vehicle, and this was probably five minutes later.
19
20            Dispatch broadcast information saying that there was a Altima with a -- a license plate
21  matching the description of the carjacked vehicle that had just crashed on Highway 86 and Avenue 62.
22
23            So I got on the Expressway with Charles K-9.  I was actually leading at one point, and I was
24  going to go down Grapefruit, because I thought the suspect vehicle might go that way.  It was just when I
25  turned onto Grapefruit that they broadcast the information, so we both turned around, and I ended up
26  following him.
27
28            We went south on 86, and we got to Avenue 62 where he went straight.  I saw some vehicles
29  on Avenue 62 that looked like something was wrong, so I went over there, started talking to people that
30  were on the side of the road.
31
32            They told me that a car had just crossed over the Expressway and crashed near the bridge.
33  One of their husbands had run over to help.
34
35            That's when K-9, and one of the other units was over there, and said that the plate matched
36  when they were clearing the vehicle.
37
38       INVESTIGATOR BUTVIDAS: Uh-huh?
39
40       CORPORAL DON OLSON:      Within a few minutes, they were flagged down by someone who
41  said the suspect had run from the vehicle and was running down the Expressway -- waving a weapon at
42  people, trying to take their cars, and that the airship then put out that they believe the suspect got into a
43  motor home.

**RIVERSIDE SHERIFF DEPARTMENT/INDIO**                    **Page 2**

1
2          The motor home -- I could see from where I was on Avenue 62, the motor home
3  approaching all the people who were out with the -- the crashed vehicle now, and -- believe it was Sergeant
4  Wedertz put out that as the driver of the motor home passed them, he put his hands up as if in surrender and
5  pointed down towards the floor indicating, you know, that possibly the suspect was in there holding them
6  hostage -- motor home went past them and approached Avenue 62 where I was waiting for the motor home.
7
8      INVESTIGATOR BUTVIDAS:  Uh-huh?
9
10      CORPORAL DON OLSON:      I got behind it, turned on my lights and sirens.  The motor home
11  kept going, maybe, 25, 35 miles an hour.
12
13      INVESTIGATOR BUTVIDAS:  And we're talking northbound; right?
14
15      CORPORAL DON OLSON:      Now, we're going northbound --
16
17      INVESTIGATOR BUTVIDAS:  Okay.
18
19      CORPORAL DON OLSON:      -- on 86.  Within a short amount of time -- a minute or two --
20  unmarked stealth units with lights and sirens closed the distance -- were behind me.  I waved them to pass
21  me, so they were -- were -- two stealth units that were now in front of me.  I continued to follow as we go
22  north on the Expressway.
23
24          At some point, the motor home stopped.  We all exited our vehicles, took cover behind the
25  doors and attempted to get the suspect to come out.  The motor home went north again.  I know the motor
26  home stopped again at Airport Boulevard -- the same type of situation.
27
28          We all got out and tried to get the suspect to come out -- motor home took off again.  At this
29  point, there was more and more CHP units involved, more sheriff's units involved.  CHP had, maybe, six or
30  seven units involved.  I believe all the sheriff's department units except for K-9 backed off.  I was in -- as
31  far back as I could go, still following -- not in pursuit -- trying to keep any traffic that might, you know,
32  catch up.
33
34      INVESTIGATOR BUTVIDAS:  Uh-huh?
35
36      CORPORAL DON OLSON:      Because the vehicle was going 40, 45 miles an hour -- tried to
37  keep any traffic from trying to get through.  At some point, passed Airport Boulevard -- CHP attempted to
38  use spike strips on the motor home.  I don't think the first attempt was successful --
39
40      INVESTIGATOR BUTVIDAS:  Uh-huh.
41
42      CORPORAL DON OLSON:      They kept going.  There was another attempt near Avenue 52
43  which flattened all the tires.  A little bit past Avenue 52, a tire came off.  Couple CHP units stopped and

**RIVERSIDE SHERIFF DEPARTMENT/INDIO**                                    **Page 3**

1   moved the tire out of the road.

2

3       INVESTIGATOR BUTVIDAS: Okay.

4

5       CORPORAL DON OLSON:    So it got to the point where almost to Dillon where the motor

6   home stopped in the roadway.

7

8       INVESTIGATOR BUTVIDAS: Okay.

9

10      CORPORAL DON OLSON:    There were seven or eight CHP units, maybe, three or four

11  vehicles wide behind the motor home. I parked my motorcycle, got up to the front, deployed my shotgun,

12  took cover behind one of the CHP units. I saw a couple officers run off to the right flank. I don't know

13  who they were.

14

15        And I heard one of them yell, "The suspect is coming out. He's got a gun."

16

17  INVESTIGATOR BUTVIDAS: Uh-huh. Uh-huh.

18

19      CORPORAL DON OLSON:    I heard shots. I heard someone say -- I had actually put out on

20  the radio that they were involved in an OIS. Suspect came out pointing a gun. He retreated back into the

21  motor home.

22

23  INVESTIGATOR BUTVIDAS: Did you -- did you see that, or that's what they put on the radio?

24

25      CORPORAL DON OLSON:    That's what -- the information that I heard.

26

27  INVESTIGATOR BUTVIDAS: Okay.

28

29      CORPORAL DON OLSON:    Either from the officers yelling or on the radio.

30

31  INVESTIGATOR BUTVIDAS: Okay.

32

33      CORPORAL DON OLSON:    I didn't -- I didn't see any of that, even though my vantage point

34  was basically the right side of the motor home from where I was taking cover.

35

36  INVESTIGATOR BUTVIDAS: Okay.

37

38      CORPORAL DON OLSON:    But I didn't see it. Within a minute or two, an elderly female

39  come out -- came out of the motor home door. *AFTER THE Shooting*

40

41  INVESTIGATOR BUTVIDAS: Uh-huh?

42

43      CORPORAL DON OLSON:    She didn't have a shirt on. She walked back. She said her

**RIVERSIDE SHERIFF DEPARTMENT/INDIO**                         Page 4

1   husband's been shot.

3          "He's still in the motor home.  Please, help him" -- something to that effect.

5          Within another 30 seconds to a minute, a person -- Hispanic male who matched the suspect
6   description that was given earlier --

8   INVESTIGATOR BUTVIDAS:  Uh-huh?

10  CORPORAL DON OLSON:        -- came out, proned out on the ground near the motor home door.
11  We, I got four or five deputies.  We formed an arrest team.

13  INVESTIGATOR BUTVIDAS:  Uh-huh?

15  CORPORAL DON OLSON:        We approached the suspect, ordered him to put his hands behind
16  his back and separate his feet.  He complied.

18  INVESTIGATOR BUTVIDAS:  Uh-huh?

20  CORPORAL DON OLSON:        Someone approached, arrested him, handcuffed him, removed
21  him.  Myself, and, I believe, it was Deputy Maxwell went into the motor home, cleared the motor home,
22  and made sure there were no other suspects.

24  INVESTIGATOR BUTVIDAS:  Uh-huh?

26  CORPORAL DON OLSON:        And then began to render aid to the -- the driver, and I asked him
27  if he was hurt, and he indicated he'd been shot in his left shoulder, and that's when I believe a CHP officer
28  came in and identified himself as a -- as a medic --

30  INVESTIGATOR BUTVIDAS:  Uh-huh?

32  CORPORAL DON OLSON:        -- and began to treat the -- the driver.

34  INVESTIGATOR BUTVIDAS:  Okay.  Did you see anything inside the RV when you went inside
35  to note?

37  CORPORAL DON OLSON:        Not -- not initially.  As the CHP officer was treating the driver --

39  INVESTIGATOR BUTVIDAS:  Uh-huh?

41  CORPORAL DON OLSON:        -- someone stated, "There's a gun on the floorboard."

43          And I asked him, "Is that -- do you have a gun in here?  Is that your gun on the floorboard?"