1  KATHLEEN A. KENEALY
   Acting Attorney General of California
2  ELIZABETH S. ANGRES
   Supervising Deputy Attorney General
3  ELIZABETH G. O'DONNELL
   Deputy Attorney General
4  State Bar No. 162453
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013
     Telephone:  (213) 897-2563
6    Fax:  (213) 897-2810
     E-mail:  Elizabeth.ODonnell@doj.ca.gov
7
   *Attorneys for Defendants*
8  *Officer S. Rivas, Officer J. Moran*
   *Officer A. Ponce, and Officer E. Pena*
9

10           IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13

14  | | |
    |---|---|
15  **JORGE LUIS VALDEZ,** | 15-CV-00805- DOC- (RAO)
16  **Plaintiff,** | **NOTICE OF MOTION AND MOTION FOR SUMMARY**
17  **v.** | **JUDGMENT OR PARTIAL SUMMARY JUDGMENT OF**
18  **DEPUTY MARIANO MATOS (MOLINA) et. al,** | **DEFENDANTS RIVAS, MORAN PONCE AND PENA TO**
19  **Defendants.** | **COMPLAINT OF PLAINTIFF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
20

21  Courtroom:    F
22  Judge:        Rozella A. Oliver
    Trial Date:   None
23  Action Filed: **April 23, 2014**

24

25

26      TO THE COURT AND PLAINTIFF JORGE LUIS VALDEZ, IN PRO SE:

27      **NOTICE IS HEREBY GIVEN** that on a date and time ordered by this

28  Court, located at 312 N. Spring Street, Los Angeles, California, in Courtroom F,

1

9th Floor, Defendants Officer S. Rivas, Officer J. Moran, Officer Ponce, and Officer Pena will move this Court for summary judgment under Federal Rule of Civil Procedure 56. This Motion is and will be made on the grounds that there is no genuine issue as to any material fact as to the foregoing issues and Defendants are entitled to judgment in their favor as a matter of law on Plaintiff's Civil Rights Claim Pursuant to 42 U.S.C. § 1983 filed on April 21, 2016.[1]

Parties are exempt from the meet and confer requirements of Local Rule 7-3 because Plaintiff is appearing pro se, is in custody, and is not an attorney. *See* C. D. Cal. L. R. 16-12. Pursuant to Local Rule 7-15, oral argument is not requested.

This Motion is based on this Notice of Motion and Motion for Summary Judgment; the accompanying Memorandum of Points and Authorities; the Statement of Uncontroverted Facts and Conclusions of Law; the Declarations and Exhibits attached thereto; all pleadings and papers on file in this action; and such other matters as the Court may deem appropriate.

Dated:  January 11, 2017

KATHLEEN A. KENEALY
Acting Attorney General of California
ELIZABETH S. ANGRES
Supervising Deputy Attorney General

/s/ *Elizabeth G. O'Donnell*
ELIZABETH G. O'DONNELL
Attorneys for Defendants
*Officer S. Rivas, Officer J. Moran*
*Officer A. Ponce, and Officer E. Pena*

---

[1] Plaintiff's Complaint is identified as a Civil Rights Complaint and contains one Claim for Civil Rights Violations based on the 4th Amendment for excessive force  and on the 14th Amendment for deliberate indifference to medical needs of a pre-trial detainee.  However, should the Court construe Plaintiff's use of the terms "assault and battery" and/or "infliction of emotional distress" in Section E, "Request for Relief," as separate state law based claims, Defendants join in the Motion for Summary Judgment filed by Defendants Matos and White as to these claims and request leave to file a supplemental motion addressing these unidentified claims.

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................1

II.  STATEMENT OF FACTS ...........................................................................2

    A.   Plaintiff Fails to Stop for the CHP and Flees.................................. 2
    B.   Plaintiff Commits a Carjacking at Gunpoint While Fleeing the CHP.2
    C.   Plaintiff Commits a Second Carjacking and Takes Hostages .............3
    D.   Plaintiff Fails to Surrender and Shoots a Hostage ..............................3
    E.   Law Enforcement Fires on Plaintiff....................................................4
    F.   Plaintiff Surrenders and is Taken Into Custody...................................5
    G.   The Role of CHP Officer Ponce ..........................................................5
    H.   The Role of CHP Officer Pena .............................................................8
    I.   The Role of CHP Officer Moran ........................................................10
    J.   The Role of CHP Officer Rivas ..........................................................12

III.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT ..................13

IV.  DEFENDANTS PONCE AND PENA ARE ENTITLED TO SUMMARY
    JUDGMENT ON PLAINTIFF'S EXCESSIVE FORCE CLAIMS..........14

    A.   Law Governing Excessive Force Claims Against Defendants Ponce
       and Pena .............................................................................................14
    B.   The Actions of Officers Ponce and Pena Were Objectively
       Reasonable In Light of the Situation and Information
       Known to Them .................................................................................15
    C.   Officer Ponce and Pena are Entitled to Qualified Immunity ............18

V.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
    PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIMS........................23

    A.   Law Governing Deliberate Indifference Claims................................23
    B.   Officers Pena, Ponce, Moran and Rivas Were not Deliberately
       Indifferent to Plaintiff's Medical Needs After He Surrendered ........24

VI.  CONCLUSION ..........................................................................................25

# TABLE OF AUTHORITIES

CASES

*Alderman v. United States*
 394 U.S. 165 (1969) ........................................................................ 18

*Anderson v. Liberty Lobby, Inc.*
 477 U.S. 242 (1986) .................................................................. 13, 14

*Ashcroft v. al-Kidd*
 563 U.S. 731 (2011) .................................................................. 20, 21

*Bell v. Wolfish*
 441 U.S. 520 (1979) ........................................................................ 23

*Benigni v. City of Hemet*
 879 F.2d 473 (9th Cir. 1988) ........................................................ 22

*Brosseau v. Haugen*
 543 U.S. 194 (2004) ........................................................................ 22

*Bryan v. MacPherson*
 630 F.3d 805 (9th Cir. 2010) .................................................. 14, 22

*Butz v. Economou*
 438 U.S. 478 (1978) .................................................................. 19, 21

*Carnell v. Grimm*
 74 F.3d 977 (9th Cir. 1996) .......................................................... 24

*Celotex Corp. v. Catrett*
 477 U.S. 317 (1986) ........................................................................ 13

*Chew v. Gates*
 27 F.3d 1432 (9th Cir. 1994) ........................................................ 14

*Estate of Ford v. Ramirez-Palmer*
 301 F.3d 1043 (9th Cir. 2001) ...................................................... 22

*Estelle v. Gamble*
 429 U.S. 97 (1976) .......................................................................... 24

*Farmer v. Brennan*
  511 U.S. 825 (1994) ........................................................................ 24

*George v. Morris*
  736 F.3d 829 (9th Cir. 2013) ........................................................ 15

*Gibson v. Cty. of Washoe, Nev.*
  290 F.3d 1175 (9th Cir. 2002) ...................................................... 24

*Graham v. Connor*
  490 U.S. 386 (1989) ...................................................... 14, 15, 17, 21

*Hagans v. Franklin County Sheriff's Office*
  695 F.3d 505 (6th Cir. 2012) ........................................................ 19

*Hope v. Pelzer*
  536 U.S. 730 (2002) ........................................................................ 22

*In re Oracle Corp. Sec. Litig.*
  627 F.3d 376 (9th Cir. 2010) ........................................................ 14

*Jeffers v. Gomez*
  267 F.3d 895 (9th Cir. 2001) ........................................................ 19

*Jett v. Penner*
  439 F.3d 1091 (9th Cir. 2006) ...................................................... 24

*Long v. City & Cty. of Honolulu*
  511 F.3d 901, 906 (9th Cir. 2007) ................................................ 23

*Long v. City & Cty. of Honolulu*
  511 F.3d 901 (9th Cir. 2007) ........................................................ 23

*Malley v. Briggs*
  475 U.S. 335 (1986) ........................................................................ 22

*Maraziti v. First Interstate Bank of California*
  953 F.2d 520 (1992) ........................................................................ 22

*Marquez v. City of Phoenix*
  693 F.3 1167 (9th Cir. 2012) ........................................................ 15

*Mattos v. Agarano*
  661 F.3d 433 (9th Cir. 2011) ........................................................ 21

*McGuckin v. Smith*
   974 F.2d 1050 (9th Cir. 1992) ............................................................ 24

*Mitchell v. Forsyth*
   472 U.S. 511 (1985) ......................................................................... 20

*Pearson v. Callahan*
   555 U.S. 223 (2009) ......................................................................... 19

*Plumhoff v. Rickard*
   572 U.S. __, 134 S.Ct. 2012 (2014). ............................................. 18, 23

*Reichle v. Howards*
   566 U.S. __ , 132 S.Ct. 2088 (2012) ................................................. 18

*Rowe v. Schreiber*
   139 F.3d 1381 (11th Cir. 1998) ......................................................... 18

*Saucier v. Katz*
   533 U.S. 194 (2001) ........................................................... 19, 20, 21, 22

*Scott v. Harris*
   550 U.S. 372 (2007) ................................................................... 14, 23

*Scott v. Henrich*
   39 F.3d 912 (9th Cir.1994) ................................................................ 23

*Tennessee v. Garner*
   471 U.S. 1 (1985); ............................................................................ 23

**STATUTES**

42 U.S.C. § 1983 ............................................................................... 1, 19

**CONSTITUTIONAL PROVISIONS**

Fourth Amendment ............................................................ 14, 18, 20, 21

Eighth Amendment ............................................................................ 24

**COURT RULES**

Fed. R. Civ. P. 56 .............................................................................. 13

Federal Rule of Civil Procedure 56(a) .................................................. 13

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

When instructed by a California Highway Patrol (CHP) Officer to pull over for a moving violation, Plaintiff, Jorge Valdez, attempted to flee, led the officer on a high speed chase and crashed the stolen vehicle that he was driving.  Running from the scene of the crash, he stole another vehicle at gunpoint and eventually crashed that vehicle before hijacking a motorhome at gunpoint, taking its two occupants hostage and forcing them to evade the pursuing police.  When the pursuit ended and Plaintiff pointed a gun at officers while standing in the doorway of the motorhome, two CHP officers and one Riverside County Sheriff's Deputy fired shots at Plaintiff.  Plaintiff suffered minor injuries as a result. Only after Plaintiff shot one of the hostages and the other escaped did Plaintiff surrender at the scene.

Plaintiff now sues four CHP Officers under 42 U.S.C. § 1983, alleging that each officer violated his Constitutional rights.  Plaintiff alleges that Officers Pena and Ponce used excessive force in their apprehension of him by firing their weapons at him during the standoff.  Plaintiff further alleges that Officers Rivas and Moran, as well as Officers Pena and Ponce, violated his rights by failing to obtain medical care for him once he surrendered and was in custody.

Officers Pena and Ponce respectfully request that this Court grant summary judgment in their favor on Plaintiff's first claim on the grounds that: (1) the level of force used by each in response to the hostage situation was reasonable in as much as Plaintiff was armed, had taken hostages, and appeared in the doorway of the hijacked motorhome brandishing a gun; and (2) they are entitled to qualified immunity for the use of force.  All four officers, Pena, Ponce, Rivas and Moran, seek summary judgment on Plaintiff's second claim on the grounds that (1) Plaintiff's injuries did not constitute a serious medical need; (2) Defendants were not aware that Plaintiff had been injured during the incident and thus did not act with a sufficiently culpable state of mind; (3) even if Defendants had known that

1

Plaintiff was injured, Defendants had no ability to seek medical attention for Plaintiff since they did not have custody of Plaintiff; (4) the 90-minute delay in Plaintiff's treatment did not cause further harm; and (5)  Plaintiff stated his desire to decline medical treatment while en route to receive medical attention.

The undisputed material facts make it clear that Officers Pena, Ponce, Rivas and Moran are entitled to summary judgment.

## II.   STATEMENT OF FACTS

On April 10, 2014, at approximately 5:00 p.m., Plaintiff Valdez was driving a stolen Toyota Matrix in Mecca, California. (Deposition of Plaintiff, Jorge Valdez (Valdez Depo.) 14:12-15:3.)  At the time, Plaintiff was on parole and carried with him a Beretta handgun. (Valdez Depo. 13:1-8; 15:22-16:4; 18:12-24; 19:21-23.) He had not slept in 10 days and had taken multiple doses of methamphetamines that day, with the last one being taken approximately 30 minutes before the pursuit began.  (Valdez Depo. 138:25-139:21.)

### A.   Plaintiff Fails to Stop for the CHP and Flees

When the CHP Officer Ponce attempted to make an enforcement stop of Plaintiff, Plaintiff responded by attempting to evade the officer. (Valdez Depo. 17:14-18:11.)  After reaching speeds of up to 60 miles per hour on city streets, Plaintiff crashed the vehicle into a tree in a housing development and escaped the scene on foot.  (Valdez Depo. 19:24-21:7.)

### B.   Plaintiff Commits a Carjacking at Gunpoint While Fleeing the CHP

Shortly after fleeing on foot, Plaintiff approached Mr. & Mrs. Torres and their young daughter in their garage and, brandishing a handgun at Mr. Torres, stole their 2002 Nissan Altima from them.  (Valdez Depo. 22:23-24:7; 24:22-24.) Plaintiff drove this car at speeds of up to 120 miles per hour before crashing the vehicle off a bridge of State Route 86. (Valdez Depo. 26:1-27:3.)  Plaintiff then abandoned the Altima on foot and attempted to flag down a vehicle on the highway

2

to continue his escape from police.

### C.   Plaintiff Commits a Second Carjacking and Takes Hostages

Plaintiff was able to stop a motorhome driven by Mr. & Mrs. Graff by standing in the middle of road.  (Valdez Depo. 29:15-30:15.)  He entered the Graff's motorhome and threatened Mr. Graff with his gun, instructing Mr. Graff to continue to drive away from the scene of the crash and multiple members of law enforcement that Plaintiff was aware were pursuing him. (Valdez Depo. 33:9-24; 53:1-5.)

Mr. Graff made a few attempts to stop the vehicle but was ordered at gunpoint by Plaintiff to keep driving. (Valdez Depo. 48:7-13; 54:1-7.)  During one of Mr. Graff's attempts, Plaintiff fired his gun into the windshield of the motorhome.  (Valdez Depo. 86:5-16; 89:1-12.)  In order to ensure that Mr. Graff continued to follow his instructions and did not attempt to injure Plaintiff, Plaintiff brought Mrs. Graff to the front of the vehicle and held her between Mr. Graff and himself as a shield.  (Valdez Depo. 43:5-13; 71:15-72:15; 74:3-75:5; 75:14-24.) Plaintiff was aware that Mrs. Graff was fearful of him during the event. (Valdez Depo. 79:8-20.)

### D.   Plaintiff Fails to Surrender and Shoots a Hostage

Mr. Graff was able to eventually bring the motorhome to a stop by turning off the motor and throwing away the key, telling Plaintiff that the motor overheated. (Valdez Depo. 80:17-81:4.)  Once the vehicle came to a stop, the more than a dozen police units from the CHP and the Sheriff's Department pursuing him also stopped. The officers began yelling to Plaintiff to exit the vehicle and throw out his weapons. Plaintiff moved to the back of the motorhome behind the driver's seat, taking Mrs. Graff with him. (Valdez Depo. 82:19-83:13.)  While he was walking to the back of the vehicle Mr. Graff shot at Plaintiff with a gun that he had previously taken out from under the driver's seat. (Valdez Depo. 84:5-85:12.)  Plaintiff responded by firing his gun at Mr. Graff, hitting him. (Valdez Depo. 84:22-85:6; 89:13-23.)

1  Plaintiff then jumped on Mr. Graff and disarmed him. During the struggle Mr.

2  Graff's gun was fired one more time. (Valdez Depo. 89:24-90:17.)

3       After shooting Mr. Graff, Plaintiff returned to the back of the motorhome and

4  sat on the couch behind the driver side across from Mrs. Graff who was on the

5  couch on the passenger side. (Valdez Depo. 93:7-98:16.)  Mrs. Graff went towards

6  Mr. Graff to check in him and Plaintiff followed her when it appeared to him that

7  she was going to try to exit the vehicle. (Valdez Depo. 96:4-14.)

8      **E.**   **Law Enforcement Fires on Plaintiff**

9       At some point the door to the vehicle was opened, but Plaintiff is unclear as

10  to when it was opened or if Mrs. Graff or he opened it.  (Valdez Depo. 96:21-97:5.)

11  Plaintiff alleges that he was standing or crouching in the doorway of the

12  motorhome when he was struck by bullets or fragments of bullets fired from

13  outside the motorhome. (Valdez Depo. 65:2-8.)  Plaintiff had heard the officers tell

14  him to exit the vehicle at least one time before the shots were fired. (Valdez Depo.

15  110:11-18;111:1-5.)  However, at no point prior to the police firing on the vehicle

16  did Plaintiff communicate to the police that he intended to surrender.  (Valdez

17  Depo. 109:20-110:1.) According to Plaintiff, he was standing to the side of Mrs.

18  Graff when the bullets were fired and he pulled her out of the way of the bullets.

19  The video of the incident shows "the head of a person barely look out" of the

20  vehicle right before shots are fired at the vehicle by police.  (Second Amended

21  Complaint, para. 8 [Dckt. #68, p. 10 of 11.])

22      When the shots stopped, the officers continued to instruct Plaintiff to throw

23  the gun out of the vehicle.  Plaintiff then retreated to the rear of the vehicle to get

24  Mr. Graff's gun so he could throw it out of the motorhome.  (Valdez Depo., 65:19 –

25  66:6.) Mrs. Graff took this opportunity to run out of the motorhome.  (Valdez

26  Depo., 66:17-23; 105:19-106:1.) Plaintiff acknowledges that prior to this time Mrs.

27  Graff slipped from his arms and fell and ended up on the floor. (Valdez Depo.

28  100:1-8.)  It was during this time that she came out of her pink shirt. When she

exited the vehicle she was carrying her shirt with her. (See MVARS Video, lodged concurrently.)

### F.   Plaintiff Surrenders and is Taken Into Custody

The standoff continued for a few minutes more, after which time Plaintiff surrendered by throwing one of the guns out the door of the motorhome and belly crawling down the stairs onto the asphalt of the road.  He was then approached by the officers and taken into custody by Sheriff's deputies. (Valdez Depo. 114:5-22; 118:1-12; 143:3-14.)  After being frisked and handcuffed Plaintiff was taken to sit in one of the police cruisers behind the motorhome.  While in the police cruiser he complained that he had been shot, was in pain, and needed medical attention and water.  (Second Amended Complaint.) Once the Mr. Graff was evacuated from the scene via helicopter and the motorhome and the scene were cleared, Plaintiff was examined by a Sheriff's Deputy and taken to the hospital for treatment.  Plaintiff received three shrapnel wounds in the incident.  (Valdez Depo. 146:3-7.)  When he observed them at the scene they were three small holes on his upper thigh/hip area, that were a little larger than the size of a pea and were no longer bleeding. (Valdez Depo. 133:6-134:13.) Plaintiff does not know the identity of any of the officers who heard him say he was injured and needed medical attention.  (Valdez Depo. 143:3-7.)

### G.   The Role of CHP Officer Ponce

Officer Ponce was situated on State Route 86 north of Airport Boulevard when he was passed by a black Toyota Matrix driven by Plaintiff at excessive speeds.  He began a pursuit of the vehicle using both lights and sirens but Plaintiff failed to pull over.  (Declaration of Officer Adalberto Ponce (Ponce Dec.) ¶ 3.) During the pursuit he learned that the Matrix was stolen.  (Ponce Dec. ¶ 4.)  The pursuit ended when Plaintiff crashed the car and ran from the scene.  Officer Ponce called in the accident and a description of the suspect who fled.  He was unable to catch Plaintiff and began blocking off the scene, asking for units to assist, and

1   working the accident, including speaking to witnesses to the crash. (Ponce Dec. ¶

2   5.)   One of the witnesses told him that the person fleeing the vehicle had a black

3   handgun in his hand.  This information was relayed to other officers over the radio.

4   (Ponce Dec. ¶ 6.)

5          Ten or less minutes after arriving at the scene Officer Ponce heard over the

6   radio that a person matching the description of the person fleeing him had carjacked

7   an Altima at gunpoint a couple of blocks from the scene of the crash of the Matrix.

8   (Ponce Dec. ¶ 7.)  Officer Ponce then heard over the radio from the CHP aerial

9   support that the Altima which had just been stolen was driving at excessive speeds

10   and crashed. Further, he heard that the driver of the Altima fled the scene of that

11   crash and carjacked a motorhome on State Route 86 at gunpoint.  (Ponce Dec. ¶ 7.)

12   He then responded to a call for all officers in the vicinity to assist in the pursuit of

13   the hijacked motorhome.   (Ponce Dec. ¶ 8.)

14          The sequence of events and description of the carjacker made Officer Ponce

15   believe that the person who had carjacked the motorhome at gunpoint was the same

16   person who had carjacked the Altima and had crashed the Matrix. (Ponce Dec. ¶ 9.)

17   When the pursuit of the motorhome came to a stop just south of Dillon Road on

18   State Route 86, Officer Ponce brought his patrol car to a stop behind the

19   motorhome, along with other patrol cars.  He exited his vehicle with his AR-15 rifle

20   and followed two officers who went into the desert brush to the right of the right

21   shoulder of the road.  (Ponce Dec. ¶ 10.)  Officer Ponce came to a rest kneeling east

22   of the motorhome 70 to 80 feet away at a forty-five degree angle from the full size

23   door on the passenger side of the motorhome.  He had an unobstructed view of the

24   door. (Ponce Dec. ¶ 10)

25          Officer Ponce heard yelling in the motorhome and the sound of someone in

26   distress.  He thought that it might be a woman or child.  (Ponce Dec. ¶ 11.)  A male

27   Hispanic, who he later learned to be Plaintiff, appeared in the doorway of the

28   motorhome and pointed a gun in the direction where Officer Ponce and the other

6

CHP officers were located.  (Ponce Dec. ¶ 12.)  Plaintiff matched the description of the person who had fled from the Matrix as well as the person who carjacked and crashed the Altima. (Ponce Dec. ¶ 12.)  When Plaintiff pointed the gun in Officer Ponce's direction, Officer Ponce believed that plaintiff intended to shoot him or the other officers and that Plaintiff was a threat to their safety.  Because of this, he fired his AR-15 rifle towards the suspect.  (Ponce Dec. ¶ 13.)  At the time that he fired his weapon, Officer Ponce only saw Plaintiff in doorway of the motorhome and no one else.  (Ponce Dec. ¶ 13.)  At no time prior to firing his weapon did Officer Ponce hear Plaintiff communicate in any way that he wanted to surrender.  Likewise, he did not hear anyone from inside the motorhome say "don't shoot" or anything similar. (Ponce Dec. ¶ 14.)

The Plaintiff briefly disappeared from the doorway and Officer Ponce stopped shooting since he no longer had a visual on him.  (Ponce Dec. ¶ 15.)  Officer Ponce then moved closer to the motorhome.  Plaintiff then reappeared in the door and to Officer Ponce, it appeared that Plaintiff had someone in a pink shirt in his other arm and was pointing his gun in the direction of who ever it was. Believing it to be child or hostage, Officer Ponce shouted for the other officers to not fire as there was a hostage.  (Ponce Dec. ¶ 15.)  The Plaintiff then disappeared from view and a few moments later an elderly lady, later identified as Mrs. Graff, stepped out of the vehicle carrying her pink shirt.  (Ponce Dec. ¶ 15.)  Officer Ponce yelled to others that someone was coming out of the motorhome and heard Officer Moran instruct the lady to walk towards the police units behind the motorhome.  (Ponce Dec. ¶ 16.)

Keeping his eyes on the door, Officer Ponce briefly saw two hands being held out of the motorhome, one with a gun in it.  At this time the officers were yelling instruction for the Plaintiff to come out and to throw the gun out of the motorhome. Officer Ponce then saw the Plaintiff throw a gun out of the motorhome.  (Ponce Dec. ¶ 17.)  Plaintiff then crawled out of the motorhome.  Because he no longer believed that the Plaintiff posed a danger to him or other officers, Office Pena did

not shoot his weapon when the Plaintiff exited the vehicle. (Ponce Dec. ¶ 18.)

Officer Ponce had no role in taking Plaintiff into custody and had no contact with Plaintiff after he surrendered to officers. (Ponce Dec. ¶ 19.) He never heard Plaintiff state that he was injured or that he wanted medical care. (Ponce Dec. ¶ 20.) Instead, in light of his involvement in the shooting, Officer Ponce stayed at his location in the brush and provided a safety statement to his superiors for approximately 30 minutes and then was driven back to the CHP office by Officer Moran. (Ponce Dec. ¶¶ 20 & 21.) He stayed in a conference room until approximately 10:30 p.m. at which time he was then interviewed by a Sheriff's Department investigator and District Attorney investigators. (Ponce Dec. ¶ 21.) He only learned that Plaintiff was injured once he returned to the CHP station. (Ponce Dec. ¶ 22.)

## H.   The Role of CHP Officer Pena

At the time that he heard about the initial pursuit, crash and the armed carjacking of the Altima over the radio, Officer Pena was working traffic control for the Cochella Music Festival. (Declaration of Officer Eric Pena (Pena Dec.) ¶ 3.) While trying to contact his Sergeant he heard over the radio that there was a second armed car jacking involving a motorhome by the same suspect. (Pena Dec. ¶ 4.) When Officer Pena heard a call go out for a spike strip he proceeded to Avenue 50 to lay one. However, when he arrived he could not locate his spike strip so he stayed to assist Officer Moran who had also arrived at Avenue 50 for the same reason. (Pena Dec. ¶ 5.)

Once the motorhome passed over the spike strip, Officer Pena returned to his vehicle and joined the pursuit of the vehicle along with other officers. When the motorhome came to stop, Office Pena stopped his patrol vehicle behind the motorhome and another patrol vehicle. He exited his vehicle with his AR-15 rifle and proceeded to the right of his vehicle, past the right shoulder and into the desert brush area. (Pena Dec. ¶ 6.) He was located just south of Officers Moran and

Ponce who were already in the desert area to his right, closer to the front of the motorhome.  (Pena Dec. ¶ 7.) At his location he had an unobstructed view of the full size door and the passenger side of the vehicle.   (Pena Dec. ¶ 7.)

The door of the motorhome opened and Officer Pena heard shots to his left that he assumed came from outside the motorhome.  Within seconds he saw a man in dark clothing, who he later learned to be Plaintiff, on the step of the motorhome doorway holding a gun by the grip and pointing the barrel in the direction where he and the other officers were located. (Pena Dec. ¶ 8.) Officer Pena could see the full body of the suspect and believed that the suspect was pointing the gun at him and the two other CHP officers in his immediate location.  (Pena Dec. ¶ 9.) Believing that the suspect was looking for a target to shoot, Officer Pena feared for his life and the life of the other officers.  He then fired his weapon towards the door of the motorhome and Plaintiff. (Pena Dec. ¶ 9.) He fired a total of five rounds.  At the time that he fired, he never saw anyone other than the Plaintiff in the doorway. (Pena Dec. ¶ 9.)  Officer Pena was unaware if he had hit Plaintiff with any of this shots but and saw flying debris from the door and possibly the dashboard of the vehicle. (Pena Dec. ¶ 10.)

When Plaintiff retreated into the motorhome Officer Pena ceased firing. (Pena Dec. ¶ 11.)  Officer Pena then heard Officer Ponce say that there was now a hostage in the motorhome near the suspect and that it was possibly a child.  (Pena Dec. ¶ 11.)  Officer Pena heard what he believed to be a woman screaming from the inside of the motorhome.  (Pena Dec. ¶ 11.) He and other officers on the scene continued to call to the Plaintiff to throw down his weapon and exit the motorhome after the shots were fired. (Pena Dec. ¶ 11.)  Shortly thereafter an elderly woman exited the motorhome and Officer Pena heard officers behind the motor home direct her to their location. (Pena Dec. ¶ 12.)  A few minutes later, Plaintiff threw his gun out of the vehicle and exited the vehicle on his stomach. (Pena Dec. ¶ 12.) Because he no longer believed that Plaintiff posed a danger to him or other officers, Officer Pena

9

1   did not shoot his weapon when Plaintiff exited the vehicle.  (Pena Dec. ¶ 12.) At no

2   time prior to firing his weapon did Officer Pena hear Plaintiff communicate in any

3   way that he wanted to surrender. Likewise, he did not hear anyone from inside the

4   motorhome tell him not to shoot or anything similar. (Pena Dec. ¶ 13.)

5        Officer Pena saw Plaintiff limping and heard him moan after he surrendered

6   and was walked to a patrol car, however Officer Pena had no role in taking Plaintiff

7   into custody and had no contact with Plaintiff after he surrendered to Officers.  He

8   never heard Plaintiff state that he was injured or that he wanted medical care.  (Pena

9   Dec. ¶ 14.)

10       Instead, in light of his involvement in the shooting, Officer Pena was required

11  to stay at his location in the brush and provided a safety statement to his superiors.

12  This lasted for approximately 30 minutes after which time he then was driven back

13  to the CHP office by Officer Moran so he could be interviewed.  (Pena Dec. ¶ 15.)

14  Officer Pena waited in the conference room until approximately 1:00 a.m., at which

15  time he was then interviewed by a Sheriff's Department investigator and District

16  Attorney investigators. (Pena Dec. ¶ 15.)  Although he had seen Plaintiff limping,

17  Officer Pena did not know either at the scene or during his interview whether

18  Plaintiff had been shot. (Pena Dec. ¶ 15.)

19  ## I.    The Role of CHP Officer Moran

20       At the time that he was made aware of the hostage and chase situation

21  Officer Moran was working traffic control for the Cochella Music Festival.  Officer

22  Moran heard over the radio that a suspect had fled from Officer Ponce, crashed his

23  vehicle and fled on foot and then carjacked an Altima at gunpoint which he then

24  also crashed.  He also heard over the radio that the suspect, who he later learned to

25  be Plaintiff, carjacked a motorhome at gunpoint and had taken its occupants

26  hostage.  (Declaration of Officer James Moran (Moran Dec.) ¶ 3.)  Officer Moran

27  heard a call over the radio for officers to respond to the area with a spike strip.  He

28  left his traffic post and proceeded to State Route 86 at 50th Avenue, which was in

front of the carjacked motorhome.  Officer Moran laid the spike strip and quickly removed it from the road after the motorhome passed over it.  (Moran Dec. ¶ 4.) He then proceeded to join the chase of the motorhome vehicle by law enforcement. He brought his patrol car to a stop on the right shoulder behind the motorhome and other police vehicles once the motorhome came to a stop in the number 2 lane of State Route 86, near Dillon Road.  (Moran Dec. ¶ 5.)

In order to get a better view of the one door to the motorhome, Officer Moran, who was wearing a bright yellow traffic control vest, went over barbed wire fence to the area of brush located on the right side of the road and the motorhome. Officer Moran took with him his AR-15 rifle.  (Moran Dec. ¶ 5.)  From his vantage he had an unobstructed view of the motorhome door. (Moran Dec. ¶ 6.)   Through the scope of his AR-15, Officer Moran could see the door of the motorhome open and an Hispanic male, who he later learned to be Plaintiff, open the door and stand in the doorway of the motorhome holding a gun.  (Moran Dec. ¶ 6.)  Officer Moran then heard shots fired from behind him and to his left. (Moran Dec. ¶ 6.)  Officer Moran never fired any of his weapons. (Moran Dec. ¶ 6.)  Prior to hearing shots Officer Moran never heard Plaintiff communicate that he wanted to surrender. Likewise, before the shots were fired he did not hear anyone from the motorhome yell "don't shoot" or anything similar. (Moran Dec. ¶ 7.)

Plaintiff then went back into the motorhome and Office Moran then heard screaming from inside. (Moran Dec. ¶ 8.) Officer Moran yelled at his fellow officers to cease fire because of the yelling of a hostage. He also yelled for Plaintiff to throw down the gun and open the door again and come out with his hands up. (Moran Dec. ¶ 8.)  When the Plaintiff finally exited the motorhome after Mrs. Graff escaped, Officer Moran was not part of the group of officers that approached Plaintiff or took him into custody.  (Moran Dec. ¶ 9.)   Officer Moran never came in contact with Plaintiff and never spoke with the Plaintiff. (Moran Dec. ¶ 10.)  He never hear Plaintiff state that he was injured or request medical care. At that time,

Officer Moran was unaware that Plaintiff had been injured or was requesting medical treatment. (Moran Dec. ¶ 10)  Approximately 30 minutes after Plaintiff surrendered, Officer Moran left the scene and returned to the CHP field office with Officers Ponce and Pena.  (Moran Dec. ¶ 11.)   He stayed with them in a conference room until CHP supervisors came to interview them regarding the incident.

### J.    The Role of CHP Officer Rivas

Office Rivas was travelling on Interstate I-10 when he heard over the radio that another officer was in pursuit of a vehicle.  As he began travelling in the direction of the first officer, he heard the updates provided by the officer, including the fact that the suspect had crashed the vehicle and fled on foot.  (Declaration of Officer Steven Rivas (Rivas Dec.) ¶ 3.)   After arriving at the scene and commencing a visual search for the fleeing suspect, Officer Rivas heard over the radio that there had been an armed car-jacking in the area he was searching.  He then heard from the CHP aerial support that the vehicle which had just been car-jacked had been crashed and the suspect was armed and was on State Route 86 attempting to stop another vehicle. (Rivas Dec. ¶ 4.)   He heard that the suspect had successfully stopped a motorhome towing an SUV traveling northbound on State Route 86 north of 62nd Avenue and had entered the vehicle at gunpoint.  While responding to the location, a call went out to set spike strips for the vehicle.  (Rivas Dec. ¶ 5.)   Officer Rivas pulled over on State Route 86 near 52nd Street and laid a spike strip.  Officer Rivas then returned to his vehicle and joined in the chase of the motor vehicle along with more than a dozen other units.   (Rivas Dec. ¶ 5.)

When the motorhome came to a rest just south of Dillon Road, Officer Rivas positioned his vehicle behind other police vehicles and himself behind his open front passenger door.  A Riverside County Sheriff's Deputy was positioned to his right. (Rivas Dec. ¶ 6.)  When Officer Rivas looked away to adjust down the volume of his radio which was broadcasting an emergency tone, the Sheriff's Deputy to his right fired his weapon.  A CHP Sergeant began to yell to Officer

1  Rivas to "watch his fire" and he responded that he had not fired.  (Rivas Dec. ¶ 7.)

2  He then moved in an easterly direction into the desert, towards Officers Moran,

3  Ponce and Pena.  A few minutes later he saw the suspect throw his gun out of the

4  motorhome and exit the vehicle.  (Rivas Dec. ¶ 8.)

5       When the Plaintiff finally exited the motorhome, Officer Rivas was not part

6  of the group of officers that approached Plaintiff or took him into custody.  (Rivas

7  Dec. ¶ 9.)   Officer Rivas never came in contact with Plaintiff and never spoke with

8  the Plaintiff, nor did he hear Plaintiff state that he was injured or that he required

9  medical care. (Rivas Dec. ¶ 10.)   Officer Rivas stayed on the scene for

10  approximately 2 more hours, establishing a perimeter with yellow caution tape and

11  then left the scene.  During the time he was on scene he was unaware that Plaintiff

12  had been shot or was requesting medical care.  He returned to the CHP office where

13  he was interviewed by Sheriff Department Investigators. (Rivas Dec. ¶11.)

14  **III.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

15       Federal Rule of Civil Procedure 56(a) provides that a party against whom

16  relief is sought may move for summary judgment on a claim or a part of each claim.

17  "One of the principal purposes of the summary judgment rule is to isolate and

18  dispose of factually unsupported claims[.]"*Celotex Corp. v. Catrett*, 477 U.S. 317,

19  323-24 (1986).

20       Summary judgment is mandated when "there is no genuine dispute as to any

21  material fact." Fed. R. Civ. P. 56. An issue is "genuine" if the evidence is such that

22  a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty*

23  *Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is "material" if it affects the right

24  to recover under applicable substantive law. *Id*.

25       The moving party may demonstrate that the non-moving party has failed to

26  "make a showing sufficient to establish the existence of an element essential to that

27  party's case, and on which that party will bear the burden of proof at trial." *Celotex*

28  *Corp. v. Catrett*, 477 U.S. at 322.  Where the movant satisfies his burden to show

1   an absence of evidence supporting the non-movant, "the burden then shifts to the

2   non-mov[ant] to designate specific facts demonstrating the existence of genuine

3   issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

4   "Only disputes over facts that might affect the outcome of the suit under the

5   governing law will properly preclude the entry of summary judgment." *Anderson v.*

6   *Liberty Lobby, Inc.*, 477 U.S. at 248. "[T]he mere existence of some alleged factual

7   dispute between the parties will not defeat an otherwise properly supported motion

8   for summary judgment; the requirement is that there be no genuine issue of material

9   fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

10   **IV.  DEFENDANTS PONCE AND PENA ARE ENTITLED TO SUMMARY**
      **JUDGMENT ON PLAINTIFF'S EXCESSIVE FORCE CLAIMS**

11

12         **A.  Law Governing Excessive Force Claims Against Defendants**
               **Ponce and Pena**

13   Plaintiff's claims of excessive force during an arrest must be analyzed under

14   the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Whether

15   the force used by peace officers was excessive is determined by the objective

16   reasonableness standard. *Id.*; see also *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir.

17   1994). The question is whether the officers' actions are "objectively reasonable" in

18   light of the facts and circumstances confronting them, without regard to their

19   underlying intent or motivation. *Graham*, 490 U.S. at 396-97. In applying this

20   standard, the Ninth Circuit instructs courts to consider "the totality of the

21   circumstances and . . . whatever specific factors may be appropriate in a particular

22   case." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

23   In *Graham*, the Supreme Court set forth factors to be considered in evaluating

24   whether the force used was reasonable, "including the severity of the crime at issue,

25   whether the suspect poses an immediate threat to the safety of the officers or others,

26   and whether he is actively resisting arrest or attempting to evade arrest by flight."

27   *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9, (1985)). In

28   addition, the Court may consider "whether officers administered a warning,

assuming it was practicable." *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 381-82, (2007)).

Ultimately, the "reasonableness" of the actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  Thus, under *Graham*, courts must avoid substituting personal notions of proper procedure for the instantaneous decision of the officer at the scene.  It is necessary to make "allowances for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Marquez v. City of Phoenix,* 693 F.3 1167, 1174 (9th Cir. 2012)(citations omitted).

**B.    The Actions of Officers Ponce and Pena Were Objectively Reasonable In Light of the Situation and Information Known to Them**

Here, numerous uncontroverted facts demonstrate that the use of force by Officers Pena and Ponce was fully and completely justified in light of the facts known to them at the time of the incident.

As noted above, in order to determine if the acts of the officers were objectively reasonable, the court must look at "the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396-97.  As noted above, the officers involved in all phases of the pursuit which led to the shooting, including Officer Ponce and Officer Pena were kept apprised via CHP dispatch of the events as they occurred or were reported by officers and citizens. (Undisputed Material Fact (UMF) No. 1.)  Thus, there is no genuine dispute that at the time of the hostage stand-off, the following facts and circumstances confronted Officers Ponce and Pena:

- Plaintiff evaded Officer Ponce and engaged him in a high speed chase when Officer Ponce tried to stop Plaintiff for speeding in a stolen Toyota Matrix.  (UMF No. 2.)

1      • Plaintiff crashed the Matrix, which was later determined to be stolen, and
2         escaped the crash scene on foot. (UMF No. 3.)
3      • A witness reported that the person fleeing the scene of the Matrix crash
4         was armed with a handgun. (UMF No. 4.)
5      • After crashing the Matrix, Plaintiff carjacked a Nissan Altima at gun point
6         a few blocks away and fled the scene at high speeds. (UMF No. 5.)
7      • Plaintiff crashed the Altima and brandished a weapon while trying to stop
8         another vehicle driving on State Route 86. (UMF No. 6.)
9      • Plaintiff entered a motorhome driven by Mr. Graff and threaten Mr. &
10        Mrs. Graff at gunpoint. (UMF No. 7.)
11     • Multiple police units were pursuing the motorhome as it fled but Plaintiff
12        did not  pull over for law enforcement despite orders to do so.  (UMF No.
13        8.)
14     • Prior to firing their weapons, both Officer Ponce and Officer Pena
15        observed Plaintiff in doorway of the motorhome pointing a gun in their
16        direction. (UMF No. 9.)
17     • Prior to firing their weapons, both Officer Ponce and Officer Pena
18        believed that Plaintiff intended to fire his gun at them or officers near
19        them. (UMF No. 10.)
20     • When Officer Ponce and Officer Pena fired at Plaintiff in the motorhome
21        doorway, they did not see anyone other than Plaintiff in the doorway.
22        (UMF No. 11.)
23     • Officers demanded that Plaintiff surrender and throw out his gun before
24        the shots were fired, but Plaintiff did not communicate to officers on
25        scene that he intended to surrender. (UMF No. 12.)
26     • At no time prior to shots being fired did Officers Ponce or Pena hear
27        Plaintiff communicate that he intended to surrender.  Likewise, they did
28        not hear anyone yell from inside the motorhome "don't shoot" or anything

similar, before shots were fired. (UMF no. 13.)

After Plaintiff threw his gun outside of the motorhome and began to exit on his belly, neither Officer Pena nor Ponce fired their weapons. (UMF. No. 14.)

*Graham* counsels to look at "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Here, Officers were faced with a suspect who (1) was driving a stolen vehicle; (2) engaged in a high speed chase; (3) crashed the stolen vehicle; (4) stole another vehicle at gunpoint; (5) engaged in a high speed chase in the second vehicle; (6) crashed the second vehicle; (7)  carjacked an occupied motorhome at gunpoint; (8) attempted to flee from law enforcement; (9) failed to respond to Officers' multiple orders to surrender; and (10) pointed a weapon at law enforcement. Clearly, the force used by Officers Pena and Ponce was reasonable in light of the circumstances and what was known to them at the time.

Plaintiff's allegation that Officers shot at him while he was attempting to surrender and that officers shot when Sharon Graff was in the doorway is both belied by the evidence and is immaterial.  First, the idea that Plaintiff tried to surrender before the shots were fired is contradicted by plaintiff's own testimony, and corroborated by the declarations of the officers.  Plaintiff never communicated to officers that he intended to surrender until <u>after</u> the shooting occurred.  (UMF No. 12.)  Likewise, officers never heard any attempt of Plaintiff to surrender before shots were fired and never heard anyone yell from inside the motorhome that they should not shoot.  (UMF No. 13.)  The court cannot look to the situation facing the officers with "the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396–97.  The can only look to the facts and circumstances confronting the officers at time.

Even if Mrs. Graff was in the doorway of the motorhome when the officers fired their weapons, Ponce and Pena did not see Mrs. Graff, but only saw Plaintiff and the gun that he was pointing in their direction.  (UMF Nos. 9 & 11.)  A review

of video taken of the incident confirms that Plaintiff appears in the doorway of the motorhome with a weapon in his hand.  See video, Declaration of  Officer Philip Watkins.  See also Second Amended Complaint, para. 8 [Dckt. #68, p. 10 of 11.][Noting the videos shows the head of a person looking out of the vehicle right.]

The officers only saw Plaintiff in the doorway when they fired, and saw Plaintiff with a gun in his hand pointed at them. (UMF Nos. 9 & 11.)  Whether or not Mrs. Graff's rights were violated because officers allegedly fired their weapons while she was near Plaintiff in the doorway is immaterial to Plaintiff's claims. Fourth Amendment rights are personal rights which cannot be asserted by someone else.  Only Mrs. Graff may raise the issue of whether her rights were violated. *Plumhoff v. Rickard*, __ U.S. __, 134 S. Ct. 2012, 2022 (2014)(*citing Alderman v. United States*, 394 U.S. 165, 174 (1969).)  Thus, the claim made by Plaintiff, that officers were reckless by firing at him when Mrs. Graff was near him in the doorway, or even, as he now claims, was between him and the doorway, is immaterial to the adjudication of whether officers used excessive force when apprehending him.

It is clear that, faced with the facts known to the Officers at the time, their decision to fire their weapons at Plaintiff was objectively reasonable.

## C.    Officer Ponce and Pena are Entitled to Qualified Immunity

Even if the court determines that the actions of Officers Ponce and Pena were not objectively reasonable, they are still entitled to judgment as a matter of law. The doctrine of qualified immunity spares peace officers from civil lawsuits arising from their law enforcement work as long as they do not violate constitutional rights that are clearly established at the time of the incident. *Reichle v. Howards*, 566 U.S. __ , 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). "Qualified immunity is the rule, not the exception." *Rowe v. Schreiber,* 139 F.3d 1381, 1385 (11th Cir. 1998).  As the Sixth Circuit has pointed out, "It is one thing to overturn a conviction based on judicial interpretations of a constitutional guarantee reached after officers make an

1    arrest; it is quite another to expose officers to the time, expense, and risk of money-

2    damages actions based on interpretations not yet clearly established." *Hagans v.*

3    *Franklin County Sheriff's Office,* 695 F.3d 505, 508 (6th Cir. 2012).  An official is

4    entitled to qualified immunity against a Section 1983 action unless: (1) the facts,

5    construed in the light most favorable to the plaintiff establish a violation of a

6    constitutional or statutory right, and (2) the right was clearly established at the time

7    of the violation. *Pearson v. Callahan,* 555 U.S. 223, 232, (2009).  The court may

8    determine these elements in any sequence.  *Id.* at 236.  Therefore, if the law

9    regarding the right in question was not clearly defined at the time of the incident,

10    qualified immunity applies and there is no need to determine whether a

11    constitutional violation actually occurred.

12     Qualified immunity is not an affirmative defense.  Rather, it is "an entitlement

13    not to stand trial or face the other burdens of litigation" and should be resolved "at

14    the earliest possible stage in litigation." *Saucier v. Katz,* 533 U.S. 194, 200-201,

15    (2001). Because qualified immunity is designed to protect from even defending the

16    action, the Court should not defer ruling on the issue in order to simply wait to let

17    Defendant win on the merits. *Jeffers v. Gomez,* 267 F.3d 895, 906–907 (9th Cir.

18    2001).

19     The protection of qualified immunity applies regardless of whether the

20    government official's error is a mistake of law, a mistake of fact, or a mistake based

21    on mixed questions of law and fact. *Butz v. Economou,* 438 U.S. 478, 507 (1978)

22    [qualified immunity covers "mere mistakes in judgment, whether the mistake is one

23    of fact or one of law"].  The United States Supreme Court recently emphasized the

24    high burden that must be met for a plaintiff to overcome qualified immunity:

25      A Government official's conduct violates clearly established law when,

26      at the time of the challenged conduct, "[t]he contours of [a] right [are]

27      sufficiently clear" *that every "reasonable official would have understood*

28      *that what he is doing violates that right."* . . . (Citations omitted) We do

1      not require a case directly on point, but existing precedent must have

2      placed the statutory or constitutional question *beyond debate*.

3  *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (Emphasis added.)  Officials are

4  immune unless "the law clearly proscribed the actions" they took.  *Mitchell v.*

5  *Forsyth,* 472 U.S. 511, 528 (1985).

6      In a Fourth Amendment case, qualified immunity requires an analysis separate

7  from whether excessive force was used in making an arrest.  *Saucier*, 533 U.S. at

8  197.  The two inquiries are "distinct."  *Id.* at 204.  In *Saucier*, the plaintiff alleged

9  the defendants had violated his Fourth Amendment rights by using excessive force

10  to arrest him.  *Id.* at 199.  The District Court denied summary judgment on the

11  plaintiff's excessive force claim, ruling that a triable issue of fact existed as to

12  whether excessive force was used.  The District Court further ruled the defendants

13  were not entitled to summary judgment on the grounds of qualified immunity,

14  finding that inquiry was "the same as the inquiry made on the merits."  *Ibid.*  The

15  Court of Appeals ruled that the plaintiff's rights under the Fourth Amendment were

16  clearly established and that it need not consider the issue of qualified immunity,

17  leaving the entire matter to the jury.  *Id.* at 200.  The Supreme Court reversed,

18  holding that denying a summary judgment based on qualified immunity because

19  there was a material issue of fact as to whether excessive force had been used

20  would "undermine the goal of qualified immunity to 'avoid excessive disruption of

21  government and permit the resolution of many insubstantial claims on summary

22  judgment.'" *Id.* at 202.

23      In addressing the issue of qualified immunity in the excessive force claim

24  before it, the *Saucier* Court emphasized the broad discretion afforded to peace

25  officers who face tense, uncertain, situations and the importance of granting

26  qualified immunity even where the officer has been mistaken in the degree of force

27  required.

28      The concern of the immunity inquiry is to acknowledge that reasonable

mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 215.

As set forth above, the general standard for excessive force set is forth in *Graham v. Connor,* 490 U.S. 386 (1986.)   However, that standard, cannot always provide fair notice to every reasonable law enforcement officer that his or her conduct is unconstitutional.  *Mattos v. Agarano,* 661 F.3d 433, 442 (9th Cir. 2011). Rather, the law "must be elaborated from case to case."  *Saucier*, 533 U.S. at 206. Qualified immunity operates in Fourth Amendment cases to "protect officers from the sometimes 'hazy borders between excessive and acceptable force, . . . and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. (citations omitted)."  *Ibid.*  Thus, in order to overcome qualified immunity, the party opposing immunity should identify a "case demonstrating a clearly established rule prohibiting the officer from acting as he did" or a relevant body of case law that clearly establishes the standard.  *Id.* at 209.  Although Plaintiff may argue the standard governing excessive force was "obvious," the standard for "obviousness" is "quite high."  *Mattos,* 661 F.3d at 442 (citing *Ashcroft*, 563 U.S. at 741.)  "[E]xisting precedent" must place the constitutional question "beyond debate."  *Ibid*.

A "mere mistake[] in judgment" is not sufficient to create liability.  *Butz*, 438 U.S. at p. 507. Instead, the burden rests with Plaintiff to prove either that Officers

21

1   Ponce and Pena were "plainly incompetent" or that they "knowingly violate[d]" the

2   law. *Estate of Ford v. Ramirez-Palmer,* 301 F.3d 1043, 1049 (9th Cir. 2001)

3   (quoting *Saucier*, *supra*, at p. 202); *Malley v. Briggs,* 475 U.S. 335, 341 (1986);

4   *Maraziti v. First Interstate Bank of California,* 953 F.2d 520, 523 (1992). Thus,

5   even if the force used here was excessive (which it was not), or even if the Court

6   determines there remains an issue of fact to go to the jury as to whether the forced

7   used was excessive, Officers Ponce and Pena are still entitled to qualified immunity

8   if they had a reasonable belief that the force they used was lawful, whether due to a

9   mistake of fact, mistake of law, or both. *Bryan v. MacPherson, 630 F.3d* at 832

10  ["If an officer's use of force was 'premised on a reasonable belief that such force

11  was lawful,' the officer will be granted immunity from suit, notwithstanding the

12  fact that excessive force was deployed."]

13       Plaintiff must establish that the "state of the law at the time" Officers Pena and

14  Ponce fired their weapons at Plaintiff was "sufficiently clear" so as to be "beyond

15  debate" such that "every reasonable official" in their position would have

16  understood what they were doing violated Plaintiff's rights. "For a constitutional

17  right to be clearly established, its contours must be sufficiently clear that a

18  reasonable official would understand that what he is doing violates that right."

19  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The inquiry into whether the law is

20  clearly established "must be undertaken in the light of the specific context of the

21  case, not as broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198

22  (2004). Only after Plaintiff meets this burden, does the burden then shift to

23  Defendants to show that their actions were reasonable, even if they violated

24  Plaintiff's rights. *Maraziti*, 953 F.2d at 523 (citing *Benigni v. City of Hemet,* 879

25  F.2d 473, 480 (9th Cir. 1988).) Plaintiff here cannot meet his burden.

26       The clearly established law gave Officers Ponce and Pena no reason to believe

27  that their conduct violated the law. In fact, the opposite is true. Officers Ponce and

28  Pena reasonably believed that their use of lethal force was lawful since it was well

established at the time of this incident that it is constitutionally permissible for

police officers to use deadly force to when an officer has probable cause to believe

that a suspect poses a threat of serious physical harm, either to the officer or to

others. *Tennessee v. Garner*, 471 U.S. 1, 11–12, (1985); *Scott v. Henrich*, 39 F.3d

912, 915 (9th Cir.1994); *Long v. City & Cty. of Honolulu*, 511 F.3d 901, 905 (9th

Cir. 2007).  This includes incidences where the suspect has been involved in high

speed chases posing a threat to civilians and officers involved in the chase. *Scott v.

Harris*, 550 U.S. 372, 384 (2007); *Plumhoff v. Rickard*, 572 U.S. __, 134 S.Ct.

2012, 2022, 188 L.Ed.2d 1056 (2014).  Both Officer Ponce and Officer Pena were

in pursuit of an armed suspect who had made multiple attempts to flee the police

and could potentially continue his flight.[2]   Further, Plaintiff was known to be

armed, to have carjacked two vehicles at gunpoint, and to have taken hostages in

the motorhome.  Officers also perceived that he had pointed his gun at them and

other officers. Under these circumstances it was reasonable of the officers to

believe that deadly force was justified, even if Plaintiff argues after the fact that he

presented no danger to the officers and intended to surrender.   *Long v. City & Cty.

of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) [Whether plaintiff "actually fired

his rifle at these officers is also immaterial. It is enough that Sterling heard the radio

transmission and observed [plaintiff] point the rifle in the officers' direction."]

Accordingly, they are entitled to qualified immunity.

## V.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIMS

### A.   Law Governing Deliberate Indifference Claims

A person who has been arrested – but not yet convicted of a crime – has a

right to medical attention under the due process clause. *Bell v. Wolfish,* 441 U.S.

---

[2] Officers could not have known that Plaintiff could not continue his flight. At the time that the Officers fired they would have been unaware that Mr. Graff had lied to Plaintiff, telling him that the engine of the motorhome  had seized and throwing the keys out the window.  Officers could not have known that Plaintiff could not continue his flight.

520, 535 (1979); *Gibson v. Cty. of Washoe, Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002); *Carnell v. Grimm,* 74 F.3d 977, 979 (9th Cir. 1996). The due process clause imposes the same duty the Eighth Amendment imposes with regard to medical care: "persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs." *Carnell,* 74 F.3d at 979; *Gibson*, 290 F.3d at 1187. "Deliberate indifference" is defined as "intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The deliberate indifference standard involves both an objective and a subjective prong.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the objective prong, the alleged deprivation must be sufficiently serious. *Ibid*. The acts must be grave enough to be "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105-106. The subjective prong requires evidence of a defendant's state of mind. *Farmer*, 511 U.S. at 837. A defendant must know of and disregard an excessive risk to inmate health or safety. *Id*. at 837.  Thus, a Plaintiff must establish what a defendant actually knew, rather than what the defendant should have known. *Ibid*.  Finally, a Plaintiff making a claim of deliberate indifference must prove that he suffered harm because of the indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see McGuckin v. Smith*, 974 F.2d 1050, 1059-1060 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

**B.    Officers Pena, Ponce, Moran and Rivas were not deliberately indifferent to Plaintiff's medical needs after he surrendered**

The undisputed facts show that Defendants were not deliberately indifferent to Plaintiff's serious medical needs and that Plaintiff cannot establish that Defendants knew of and disregarded "an excessive risk to [his] health or safety." *Estelle, 429 U.S. at* 837. To begin with, none of the named CHP Defendants were involved in taking Plaintiff into custody and none of them approached or spoke with Plaintiff

after he was taken into custody.  (UMF Nos. 15 -18.)  While Plaintiff alleges that he was required to sit in a patrol car for almost two hours after being taken into custody, all but one of the four named CHP Officers Defendants left the scene within 30 minutes of the shooting.  (UMF No. 19.)  Plaintiff testified that while he told the officers escorting him that he was in pain, he did not say that he thought he had been shot until he was in the back of the patrol car. (UMF No. 20.)  Regardless, none of the Defendant Officers heard Plaintiff state that he was injured and required medical care. (UMF No. 22.)  When asked, Plaintiff could not identify any CHP Officer who he told that he was injured and needed assistance. (UMF No. 21.)

Additionally, Plaintiff's injuries did not pose "an excessive risk to [his] health or safety" since his injuries were limited to three lacerations caused by bullet or motorhome debris which were each slightly larger than the size of a pea.  (UMF No. 23.)  By the time Plaintiff was examined by Sheriff's Deputies for injuries at the scene, Plaintiff was no longer bleeding.  (UMF. No. 24.)  The alleged delay in treating Plaintiff did not cause him any further harm than he had already suffered as a result go the incident.  The non-urgent nature of his injuries was emphasized by the fact that Plaintiff expressed a desire to forgo medical treatment and to be taken directly to prison.  (UMF No. 25.)  Sheriff's Deputies, took him to the hospital nonetheless.  Officers Ponce, Pena, Moran and Rivas clearly cannot be held liable for a failure to provide Plaintiff with medical care after his capture.

## VI.  CONCLUSION

For the forgoing reason, Defendants request that the court enter judgment in their favor on the claims of Plaintiff Jorge Luis Valdez.

Dated:  January 11,  2017

KATHLEEN A. KENEALY
Acting Attorney General of California
ELIZABETH S. ANGRES
Supervising Deputy Attorney General

/s/ *Elizabeth G. O'Donnell*
ELIZABETH G. O'DONNELL  *Attorneys for Defendants  Rivas, Moran, Ponce, and Pena*

25